# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF  NEW YORK

---

BANCO DEL AUSTRO, S.A.

              **Plaintiff(s),**

        *-against-*

WELLS FARGO BANK, N.A.

             **Defendant(s).**

Index No.

**Summons**

Date Index No. Purchased:

---

To the above named Defendant(s)

    Wells Fargo Bank, N.A.
    c/o CSC - Lawyers Incorporating Service
    2710 Gateway Oaks Dr Ste 150N
    Sacramento CA 95833

    You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis of venue is  a forum selection clause
which is  found in Paragraph 7.9 of Exhibit A to the Complaint

Dated:  1/7/2016

                        WNF Law, P.L.

                        by
                        John G. Marfoe
                        Attorneys for Plaintiff
                        1111 Brickell Avenue, Suite 2200
                        Miami FL 33131

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------x

BANCO DEL AUSTRO, S.A.                          Index#:

                        Plaintiff,

       -against-

WELLS FARGO BANK, N.A.

                        Defendant.

-------------------------------------------------------x

## COMPLAINT

1. Banco del Austro, S.A. ("BDA"), sues Wells Fargo Bank, N.A. ("WFB"), for breaches of contractual, statutory and common law duties related to unauthorized debits from BDA's correspondent account maintained at WFB, and states:

### PARTIES, JURISDICTION AND VENUE

2. Plaintiff BDA is a foreign bank incorporated and organized under the laws of Ecuador.

3. Defendant WFB is a national banking association organized and existing under the laws of the United States, with its head office in San Francisco, California, and its registered office in Sioux Falls, South Dakota.

4. Pursuant to the agreement between BDA and WFB entitled "Terms and Conditions for Global Financial Institutions" (the "Agreement"), the parties agreed that any legal proceeding against WFB may be

commenced in the courts of the Borough of Manhattan, New York City, in the State of New York.  Agreement ¶ 7.9.

5.  This Court thus has personal jurisdiction over WFB because WFB consented to be sued in the courts of the Borough of Manhattan, New York City, in the State of New York pursuant to paragraph 7.9 of the Agreement.

6.  In addition, venue is proper in New York County, New York, because WFB consented to the forum selection clause in paragraph 7.9 of the Agreement, and BDA designates New York City in the State of New York as the venue in this action.

## FACTS

*Correspondent Account Relationship between BDA and WFB*

7.  BDA has no branches in the United States.

8.  Accordingly, BDA needed a correspondent banking relationship with a United States-based bank to conduct international banking operations, including funding overseas payments and wiring transfers requested by its clients in Ecuador.

9.  As a result, BDA and WFB commenced a correspondent banking relationship that led to the establishment of BDA's correspondent account with WFB (hereinafter, the "Correspondent Account").

10. The correspondent banking relationship was governed in part by Wells Fargo Bank, N.A.'s Terms and Conditions for Global Financial

Institutions, which was executed in February 2011 (hereinafter, the "Agreement," a true and correct copy of which is attached hereto as Exhibit "A").

11. The terms of the Agreement consisted of BDA agreeing to pay correspondent banking fees to WFB, and WFB agreeing to service BDA's Correspondent Account, perform transactions properly authorized by BDA, and safeguard the property of BDA's Correspondent Account by complying with various laws of the United States and general US commercial banking practices, including implementing a program for fraud detection, and reporting to BDA any unusual or suspicious activity impacting BDA's Correspondent Account.

12. Indeed, WFB assured BDA that not only would the relationship be also governed by the laws of the State of New York, including Article 4A of the Uniform Commercial Code, but also that WFB would comply with all Laws of the United States applicable to it, including the USA PATRIOT ACT, and general US commercial banking practices. Agreement ¶¶ 7.7 and 7.8.

13. As part and parcel of such commitment, WFB acknowledged that WFB's compliance with Laws to which it is subject may affect the transactions BDA may conduct with, or through, WFB and may require that BDA provide or certify information to WFB about itself or any entity or class of entities transacting payments or other business through BDA's

Correspondent Account or through BDA's use of other services. Agreement ¶ 7.8.

14. On July 31, 2014, WFB further boasted to BDA that WFB, through its financial crimes risk management program ("Global FCRM Program") designed to comply with the various laws of the United States[1], had detective controls, which included identifying unusual activity; automated transaction monitoring; customer surveillance; investigating the unusual activities identified, and determining whether they are suspicious; monitoring customer activity, and applying predictive analytics for customer-centric, cross-channel fraud detection; screening, blocking, and rejecting transactions appropriately; and reporting these matters (along with other regulatory reporting requirements).

15. Accordingly, WFB assured BDA that WFB had security policies and procedures in place necessary to detect and deter suspicious or fraudulent activity and to report them to BDA (along with other regulatory reporting requirements), which reporting would alert BDA of such anomalous activity, and allow BDA to prevent the fraud.

16. Based on WFB's assurances, BDA reasonably expected to be alerted by WFB if WFB observed or should have observed any suspicious activity,

---

[1] WFB specifically represented that, through its Global FCRM Program, it managed *financial crimes* risks associated with Bank Secrecy Act ("BSA"), Anti-Money Laundering ("AML"), *External Fraud*, and other laws.

which had the potential to materially impact BDA's Correspondent Account.

17. Indeed, consistent with general US commercial bank practices, like the ones represented by WFB, BDA reasonably expected to be alerted by WFB if the Correspondent Account experienced any unusual activity, and to have WFB block any anomalous activity.

18. Pursuant to the terms of the Agreement, BDA would generate the wire transfers using the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") network, which must be accessed from within BDA's computer system.

19. The Agreement further provided that for SWIFT messages, the SWIFT Authentication procedures with the SWIFT User Handbook would be used as the Security Procedure to verify that BDA was the originator of a payment order.  Agreement ¶ 3.1.

20. However, although the SWIFT Authentication procedure would be used to verify whether BDA was the originator of a payment order, (Agreement ¶ 3.1), it could not be used to verify whether suspicious activity originating from BDA's SWIFT terminal was fraudulent (due to third-party hacking, as happened in this case) or in fact authorized by BDA (as both would show as "originating" from BDA).

21. BDA reasonably expected that, based on WFB's own material representations, such fraud detection would be done by WFB using its detective controls pursuant to WFB's Global FCRM Program.

***Suspicious Activity in the Account (the Unauthorized Transfers)***

22. On January 21, 2015, BDA reported to WFB that unauthorized debits from the Correspondent Account were made by WFB, and that those unauthorized debits were determined to be fraudulent transactions.

23. As a result of the fraudulent transactions, on January 21, 2015, BDA issued fraud alerts through SWIFT to WFB for the unauthorized transfers which are detailed below (collectively, they shall hereinafter be referred to as the "Unauthorized Transfers"):

|  | Date | Time | Sender | Amount (US$) | Beneficiary | Beneficiary's Bank | City |
|---|---|---|---|---|---|---|---|
| 1. | 1/12/2015 | 7:24 pm | Marina Breeze | $986,256.88 | Mester Trading Corp. | HSBC | Hong Kong |
| 2. | 1/12/2015 | 7:02 pm | Femar | $1,424,638.06 | Regal Prosper Trading Limited | HSBC | Hong Kong |
| 3. | 1/13/2015 | 7:04 pm | Constrin dec, S.A. | $1,236,578.45 | Regal Prosper Trading Limited | HSBC | Hong Kong |
| 4. | 1/13/2015 | 9:16 pm | Econotra ns Ecuador | $663,297.31 | Regal Prosper Trading Limited | HSBC | Hong Kong |

| 5. | 1/13/2015 | 10:38 pm | Econotrans Ecuador | $96,325.23 | Nectali Martinez Hernandez | JP Morgan Chase | New York |
|---|---|---|---|---|---|---|---|
| 6. | 1/14/2015 | 12:01 am | Audiolec | $1,485,230.89 | Regal Prosper Trading Limited | HSBC | Hong Kong |
| 7. | 1/14/2015 | 11:51 pm | Constrindec, S.A. | $1,375,240.23 | Regal Prosper Trading Limited | HSBC | Hong Kong |
| 8. | 1/14/2015 | 7:06 pm | Audiolec | $1,486,230.22 | Jose Mariano Castillo | Wells Fargo | L.A. |
| 9. | 1/16/2015 | 6:29 pm | Cosmica | $1,056,780.56 | Fratelli Investments Limited | Mashrebank PSC | Dubai |
| 10. | 1/20,2015 | 6:56 pm | Indisir | $298,223.15 | No Beneficiary Identified | HSBC | Hong Kong |
| 11. | 1/20/2015 | 11:46 pm | Raslogec | $95,731.18 | JGM Asia Telecom | Hang Seng Bank | Hong Kong |
| 12. | 1/21/2015 | 7:56 pm | Autoline | $1,968,230.25 | Jiushun Group Co. | HSBC | Hong Kong |
| | | | **TOTAL:** | $12,172,762.41 | | | |

24. True and correct copies of the Unauthorized Transfers are attached as Exhibit "B" hereto.

25. A routine manual and/or automated comparison of each of the Unauthorized Transfers to the normal activity in the Correspondent

Account would have flagged each of them as unusual or unexpected, and thus indicative of fraud.

26. Indeed, some or all of the Unauthorized Transfers exhibited the following unusual or anomalous characteristics:

   a. Unusual times of day for the SWIFTs (given that all were outside normal operating hours of BDA's SWIFT);

   b. Unusual amounts;

   c. Unusual beneficiaries in unusual geographic locations (ten out of the twelve transfers were to beneficiaries located in Hong Kong and Dubai);

   d. Unusual frequency of transfer (twelve in nine days, with the second, third and fourth transfers being to the <u>same</u> entity in Hong Kong within the span of a mere two days for substantial sums of money); and

   e. The same beneficiary receiving funds from multiple originators (e.g., Regal Prosper Trading Limited receiving funds from <u>three</u> different customers of BDA).

27. In sum, the Unauthorized Transfers were made in unusual times of the day, in unusual amounts, to unusual beneficiaries in unusual geographic locations (ten of twelve, including the first four), and in an unusual frequencies.  For example, three of the first four wires, in the amounts of $1,424,638.06, $1,236,578.45 and $663,297.31, were created outside the

normal operating business hours of BDA and its SWIFT system, were in high amounts, sent to the **same** entity ("Regal Prosper Trading Limited") in an unusual geographic location (Hong Kong), within the span of only two days (January 12 and 13, 2015), from **three** different customers of BDA.

28. In addition, although the twelfth Unauthorized Transfer for $1,968,230.25 was made after business hours at 7:56 pm on January 21, 2015, WFB processed the Unauthorized Transfer despite BDA's alerting WFB of the fraudulent nature of the transaction a mere three hours after the Unauthorized Transfer's SWIFT message was sent.

29. Despite the numerous anomalies in the Unauthorized Transfers, WFB inexplicably failed to block them and/or alert BDA of the suspicious activity.

30. Had WFB, at a minimum, notified BDA of the suspicious activity, the loss would have been avoided, inasmuch as BDA would have notified WFB in response that the suspicious activity was in fact fraudulent.

31. Indeed, on January 21, 2015, after conducting a regular audit of the Correspondent Account, BDA discovered the Unauthorized Transfers. BDA discovered that for each Unauthorized Transfer, an unauthorized user remotely accessed BDA's computer system after hours, logged onto the SWIFT network purporting to be BDA, and redirected transactions to new beneficiaries with significant dollar amounts.

32. Upon discovery of the fraud, BDA promptly informed its correspondent banks, including WFB, that received unauthorized transfers about the fraudulent nature of the transactions and sought to have the transactions cancelled and its funds returned.

33. On January 27, 2015, Citibank refunded the sum of US$1,845,286.86 to BDA as a result of the fraud alert issued by BDA as to an unauthorized transfer to its correspondent account maintained at Citibank for the same amount.

34. On February 18, 2015, WFB made a partial refund of the Unauthorized Transfer in the amount of US$1,486,230.22 by refunding the sum of US$958,700.27 to BDA as a result of the fraud alert issued by BDA. Inexplicably, WFB only made a partial refund despite the Unauthorized Transfer being traced to one of its customers.[2]

35. By letter dated April 7, 2015, BDA reiterated its demand to WFB for the immediate refund of the Unauthorized Transfers to BDA's Correspondent Account.  A true and correct copy of the letter is attached hereto as Exhibit "C."

36. BDA also initiated proceedings in Hong Kong against various recipients of the Unauthorized Transfers in an effort to recover funds from the

---

[2] Egregiously, instead of refunding all of the Unauthorized Transfers, as the law requires, WFB notified BDA on February 20, 2015, that it had "ascertained that [the] relationship with Banco del Austro ('BDA', 'you', and 'your') no longer

Unauthorized Transfers. The claims are for unlawful receipt and retention of funds, unjust enrichment and restitution, injunctive relief, and an accounting related to the Unauthorized Transfers.

37. All conditions precedent to this action have occurred, been waived, or excused, or WFB is estopped from asserting the existence of any or all such conditions by its own conduct.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
<u>**BREACH OF CONTRACTUAL DUTIES**</u>

38. Plaintiff BDA incorporates by reference paragraphs 1 to 37 as if fully set forth herein.

39. Under the terms of the Agreement, in return for payment of correspondent banking fees, WFB agreed to verify the authenticity of SWIFT payment orders pursuant to the SWIFT Authentication procedures in accordance with the SWIFT User Handbook, and to act, as to the payment orders, in compliance with all applicable laws and general US commercial bank practices. Agreement ¶¶ 3.1 and 7.7.

40. Pursuant to general banking practices, commercial banks in the United States implement and follow "know your customer" and fraud detection policies and procedures designed to detect and deter suspicious activity in the accounts, and to report such anomalies to, among others, its customers.

---

meets [its] business profile requirements." As a result, WFB closed the

41. Consistent with industry practice, WFB trumpeted to BDA that it implemented and followed its Global FCRM Program as a fraud detection mechanism.

42. According to WFB's assurances, its Global FCRM Program's Second Pillar contained internal controls divided in "preventive" and "detective."

43. Among the "detective" internal controls, WFB boasted to BDA that it included the ability to identify unusual activity in the account, apply predictive analytics for customer-centric, cross-channel fraud detection, screen, block and reject suspicious transactions, and report these matters (along with other regulatory reporting requirements).

44. WFB materially breached its contractual duties by failing to detect, block and report the Unauthorized Transfers.

45. As a direct and proximate result of WFB's material breaches of contract, BDA has suffered damages.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF STATUTORY DUTIES

46. Plaintiff BDA incorporates by reference paragraphs 1 to 37 as if fully set forth herein.

47. Section 4-A-204(1) of the Uniform Commercial Code provides in pertinent part that:

---

Correspondent Account.

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is ... not authorized and not effective as the order of the customer under Section 4-A-202, ...the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

48. BDA did not authorize the Unauthorized Transfers.

49. BDA is not otherwise bound to the Unauthorized Transfers by the law of agency, as the Unauthorized Transfers were transmitted electronically via SWIFT.

50. Thus, the Unauthorized Transfers are not enforceable pursuant to Section 4-A-202(1) of the Uniform Commercial Code.

51. The Unauthorized Transfers are also not enforceable pursuant to Section 4-A-202(2) of the Uniform Commercial Code because WFB failed to accept the Unauthorized Transfers in good faith and in compliance with the security procedure agreed-upon in the Agreement.

52. Under the terms of the Agreement, in return for payment of correspondent banking fees, WFB agreed to verify the authenticity of SWIFT payment orders pursuant to the SWIFT Authentication procedures in accordance with the SWIFT User Handbook.

53. The Agreement further protected BDA against the risk of unauthorized payment orders by requiring that WFB act, as to the payment orders, in

compliance with all applicable laws and general US commercial bank practices. Agreement ¶¶ 3.1 and 7.7.

54. Thus, WFB not only had to comply with the SWIFT Authentication procedures, but also with all applicable laws and general US commercial bank practices, including any fraud detection policies and procedures adopted by it and represented to BDA.

55. Pursuant to general banking practices and in compliance with US law, commercial banks in the United States implement and follow "know your customer" and fraud detection policies and procedures designed to detect and deter suspicious activity in the accounts, and to report such anomalies to, among others, its customers.

56. Consistent with industry practice and to comply with US laws, WFB trumpeted to BDA that it implemented and followed its Global FCRM Program as a fraud detection mechanism.

57. According to WFB's assurances, its Global FCRM Program's Second Pillar contained internal controls divided in "preventive" and "detective."

58. Among the "detective" internal controls, WFB boasted to BDA that it included the ability to identify unusual activity in the account, apply predictive analytics for customer-centric, cross-channel fraud detection,

screen, block and reject suspicious transactions, and report these matters (along with other regulatory reporting requirements).[3]

59. WFB failed to detect, block and report the Unauthorized Transfers under its Global FCRM Program.

60. In doing so, WFB failed to properly follow the security procedure, with the limitations in place designed to further protect BDA.

61. In addition, WFB failed to accept the Unauthorized Transfers in good faith because it failed to observe reasonable commercial standards of fair dealing.

62. Specifically, WFB failed to comply with its own fraud detection policies and procedures, which it trumpeted to BDA.  It failed to detect, block and report to BDA the Unauthorized Transfers, despite their various unusual or anomalous characteristics.

63. In view of the various anomalies and unusual activity related to the Unauthorized Transfers, WFB's failure to detect, block and report to BDA the Unauthorized Transfers demonstrates a lack of good faith.

64. As a result, section 4-A-204(1) of the Uniform Commercial Code requires that WFB refund the Unauthorized Transfers (minus any amounts already refunded), plus interest.

---

[3] Thus, WFB boasted that its Global FCRM Program was "customer-centric."  In effect, WFB represented that its Global FCRM Program was customized to meet the circumstances of the particular customer, including its size, type and frequency of payment orders (i.e., normal account activity).

65. To date, WFB has failed to comply with section 4-A-204(1) by refusing to refund the Unauthorized Transfers (minus the amount already refunded) to BDA.

66. As a direct and proximate result of WFB's breaches of its statutory duty, BDA has suffered damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## BREACH OF COMMON LAW DUTIES

67. Plaintiff BDA incorporates by reference paragraphs 1 to 10, 14 to 18, and 21 to 37 as if fully set forth herein.

68. BDA was entitled to the protections afforded by law to customers of financial institutions.

69. Under the law, WFB owed BDA a duty of care independent of the Agreement.

70. WFB had an independent duty of care in providing correspondent banking services to BDA in a manner consistent with reasonable industry standards, including the implementation and proper execution of adequate "know your customer" and fraud detection policies and procedures, as trumpeted by WFB.

71. Consistent with reasonable industry standards, WFB's duty of care required that it implement and follow "know your customer" and fraud detection policies and procedures designed to monitor for suspicious activity in the Correspondent Account, screen, block, and reject

anomalous transactions in the Correspondent Account, and report those anomalous transactions in a timely manner to BDA.

72. Under the circumstances, WFB violated its duty of care by negligently honoring the Unauthorized Transfers, and thereby negligently failing to properly monitor the Correspondent Account for suspicious activity, failing to screen, block and reject the Unauthorized Transfers, and/or failing to report the Unauthorized Transfers in a timely manner to BDA.

73. Each Unauthorized Transfer should have triggered an alert at WFB pursuant to proper "know your customer" and fraud detection policies and procedures in place.  WFB should have recognized and blocked the Unauthorized Transfers as suspicious and anomalous, given the expected and actual activity in the Correspondent Account.

74. This recognition should have then triggered a reporting process that would have notified BDA of the Unauthorized Transfers.

75. Such a simple reporting process would have revealed the scheme by outsiders and averted the losses resulting from the Unauthorized Transfers, as BDA would have verified that any of the transactions at issue was unauthorized.

76. As a direct and proximate result of WFB's negligence, BDA suffered damages.

WHEREFORE, the Plaintiff respectfully demands judgment against the Defendant on the First, Second, and Third Causes of Action for compensatory

damages, plus costs, interest, and attorney's fees, together with all other and

further such relief that the Court may deem just and necessary.

Dated:  January 7, 2016

/s/ John G. Marfoe
John G. Marfoe, Esq.
WNF Law, P.L.
Attorneys for Plaintiff
1111 Brickell Ave., Suite 2200
Miami, Florida 33131

Case 1:16-cv-00282-LAK Document 14-16 Filed 01/19/16 Page 21 of 59

# EXHIBIT "A"



**WELLS FARGO**

Wells Fargo Bank
Oficina de Representación Ecuador

Representante Autorizado por la Superintendencia
de Bancos y Seguros del Ecuador

Via Laar Courier

February, 2nd 2011

BANCO DEL AUSTRO
Sucre y Borrero esquina

Cuenca

Attn: Mr. Fausto Cordova- Subgerente General

Re: Wells Fargo Bank, National Association, Terms & Conditions for Global Financial
Institutions

Dear Fausto:

I am happy to enclose the Wells Fargo Bank, National Association, Terms and Conditions for
Global Financial Institutions ("Terms & Conditions") sent from our USA head office to you for
your reference.

These Terms & Conditions constitute an agreement between Wells Fargo Bank, National
Association ("Wells Fargo") and your institution and govern the relationship between us for
certain credit and trade services and for depository services on accounts maintained with Wells
Fargo in the United States. All prior general terms and conditions are superseded by this
document. Please retain these Terms & Conditions as your record of the agreement between us.
These Terms and Conditions may be supplemented from time to time by additional
documentation if you elect to use various products offered by Wells Fargo.

Please acknowledge your receipt of these Terms & Conditions by signing and dating in the spaces
provided below.

We take this opportunity to thank you for your business and we hope to continue and to grow the
existing excellent relationship you have with Wells Fargo.

Best regards,

Wells Fargo Bank, National Association

By: _____
Lorena Castillo Jurado
Vicepresident - Relationship Manager

For and on behalf of BANCO DEL AUSTRO the Terms & Conditions referenced in the above letter
are accepted on this _____ day of _____, 20____

By: _____
Fausto Cordova - Subgerente General

Together we'll go far





*Wells Fargo Bank, N.A.*

# Terms & Conditions for Global Financial Institutions



Together we'll go far

# Part 1: Introduction

These Terms and Conditions for Global Financial Institutions ("Terms & Conditions") form an agreement between Wells Fargo Bank, N.A. ("Wells Fargo"), and each Correspondent that maintains an Account in the US or that receives other Services from Wells Fargo that are indicated as governed by these Terms & Conditions. All Services provided are discretionary unless otherwise indicated.

By accepting these Terms & Conditions, or by using the Account or other Services, Correspondent agrees to be legally bound by the Terms & Conditions, as amended from time to time including by provisions contained in Service Descriptions related to certain Services provided by Wells Fargo to Correspondent. Correspondent agrees that if any terms and conditions of the Service Descriptions, whether now existing or existing or amended in the future, conflict with the terms of these Terms & Conditions, the terms and conditions of Service Description(s) for Services described therein will control.

Upon reasonable notice to Correspondent, Wells Fargo may: (i) modify procedures or Services, including, without limitation, requiring minimum balances or security without amending the Terms & Conditions; and (ii) amend the Terms & Conditions.

All capitalized defined terms used in these Terms & Conditions and Service Descriptions unless otherwise specifically defined in the text will have the meanings set forth in Part 8 Definitions hereof.

# Part 2: Account Procedures

## 2.1   Authentication and Authorized Signatures

Correspondent must utilize authenticated SWIFT message formats, tested telex or other agreed upon message formats to communicate with Wells Fargo, and Wells Fargo will be entitled to rely upon all such messages appearing to have been sent by Correspondent. Wells Fargo may require that Correspondent provide a document to Wells Fargo that sets forth the names, signatures and titles of all Authorized Representatives (subject to any limits on Authorized Representatives' authority described by Correspondent) who may evidence Correspondent's agreement to become obligated in any manner. Correspondent is responsible for notifying Wells Fargo of any changes to the Authorized Representatives.

Wells Fargo will not be bound by such changes until actual receipt by the Relationship Manager of a revised document from Correspondent and the passage of a reasonable time for Wells Fargo to implement such revised document. Correspondent may use an Electronic Signature or Endorsement that is not made by a handwritten signature on any Items or other instruments, documents or agreements with or without a designation of the party making such signature or endorsement. Wells Fargo is not liable for Correspondent's use of an Electronic Signature or Endorsement device and Correspondent bears the risk of any unauthorized use of Correspondent's Electronic Signature or Endorsement device. Correspondent agrees that Wells Fargo may follow all directions, orders or instructions, including, without limitation, instructions to pay and charge Correspondent's Account for Items or other instruments, documents or agreements bearing or purporting to bear the Electronic Signature or Endorsement of any person or persons required to sign, regardless of by whom or by what means the actual or purported Electronic Signature or Endorsement may have been affixed (whether or not authorized), and regardless of by whom or by what means the Electronic Signature or Endorsement was created (whether or not authorized).

## 2.2   Delivery of Account Statements/Advices

Wells Fargo will provide Correspondent with detailed transaction and balance information through SWIFT, web based systems, courier, mail, or other method as may be mutually agreed by Wells Fargo and Correspondent. If agreed between Wells Fargo and Correspondent, debit and/or credit advices will be sent to Correspondent. Wells Fargo may elect to send debit and/or credit advices either electronically through SWIFT, telex or facsimile, or by mail or courier depending upon the Service and/or product.

## 2.3.   Review of Statements/Reconciliation

Correspondent all is responsible for promptly and carefully examining all transaction and balance information and must immediately notify Wells Fargo of any irregularities, alterations, erroneous payments or credits, or other problems which occur in connection with the Account. All Account information contained in any statements, including balance and transaction information, advices and any other means of communicating Account information, including notices, is considered correct unless Correspondent delivers written notice to Wells

Fargo of any dispute within sixty (60) calendar days of the closing date of the statement or the date appearing on the advice or other communication regarding the Account. Notification must specifically describe the transaction or balance information and include photocopies of any relevant documents along with: (i) Correspondent's Account title and Account number; (ii) the Dollar amount of the transaction; (iii) Wells Fargo's transaction reference, if available; (iv) Correspondent's transaction reference; and (v) the nature of the problem. Wells Fargo abides by the rules and guidelines of BAFT-IFSA and the Clearing House Association L.L.C. and any successor companies or divisions with regard to the payment of interbank compensation. Wells Fargo reserves the right to make a final reasonable determination about whether and in what amount an adjustment, if any, will be made.

Subject to the next sentence, if Correspondent is able to show that Wells Fargo failed to exercise ordinary care in paying any unauthorized transaction and that Wells Fargo's failure directly and substantially contributed to a loss, the parties agree that the loss will be allocated between Wells Fargo and Correspondent based on the extent to which Wells Fargo's failure to exercise ordinary care contributed to the loss. Correspondent agrees that Wells Fargo does not fail to exercise ordinary care (i) because Wells Fargo uses automated check processing procedures and does not visually examine or verify signatures on all Items; or (ii) because Items are forged counterfeited, or altered in such a manner that a reasonable person would not detect such forgery, counterfeit, or alteration. Notwithstanding the foregoing, if Correspondent fails to discover and report these or any other errors or discrepancies within the sixty (60) calendar day period, Correspondent loses all rights it may have to assert the error or discrepancy against Wells Fargo, regardless of whether Wells Fargo has exercised ordinary care with respect to the transaction.

## 2.4.  Balances/Overnight Investment of Excess Funds

Liquidity solutions designed to enhance the return on Correspondent's excess funds can be arranged with certain conditions. Excess funds in an Account may be invested offshore overnight in Eurodollars in Wells Fargo's Cayman Islands Branch (while invested offshore overnight, these are called "Cayman Islands Deposits"). Cayman Islands Deposits are not insured by the Federal Deposit Insurance Corporation. If Wells Fargo were ever liquidated, Cayman Islands Deposits are considered foreign bank deposits and, as such, these deposits have lesser preference than domestic deposits. Cayman Islands Deposits are not insured by the government of the Cayman Islands, the government of the United Kingdom or any of their respective agencies and Correspondent is entitled only to demand payment of Cayman Islands Deposits outside the US, without regard to whether Wells Fargo may have previously made payments to Correspondent at an office in the US.

## 2.5   Overdrafts and Overdraft Charges

If Wells Fargo determines at any time that the payment of any Item or payment order would result in an overdraft on the Account, Wells Fargo, in its sole discretion, may: (i) refuse to pay and return any Item and/or to reject any payment order, or (ii) accept and process any Item or payment order and create an overdraft and charge fees and interest for the overdraft in accordance with Wells Fargo's policy. An overdraft fee and interest is charged occurs when the Available Balance is below zero. Wells Fargo is not required to send Correspondent prior notice on Items returned or payment orders rejected for any reason including, but not limited to, insufficient funds. The honoring of one or more overdrafts does not obligate Wells Fargo to honor any future overdrafts, and Correspondent must not rely on Wells Fargo to honor an overdraft even if Wells Fargo has done so in the past. Any overdraft will be due and payable immediately and interest will accrue thereon until paid in full at a rate determined by Wells Fargo, not to exceed the maximum lawful rate of interest. Correspondent agrees to deposit immediately sufficient, finally collected funds in the Account to cover any such overdraft and related fees, costs and interest. If Wells Fargo exercises its right of Setoff, but there are insufficient funds in any Account to satisfy the overdraft, Wells Fargo will be entitled to otherwise recover from Correspondent any overdraft that remains under law or in equity.

## 2.6   Payment of Service Fees

Correspondent agrees to pay any Service fees assessed for the Services described in or incorporated into the Terms & Conditions and Service Descriptions. Service fees will be reviewed on a periodic basis and adjustments will be made subject to market standards for Services and activities and are subject to change at Wells Fargo's discretion. Notice of any change in Service fees will be sent to Correspondent at the address shown on Wells Fargo's records, and a reasonable period of time will be given before any changes become effective.

Payment for the Services will be at Wells Fargo's rates in effect from time to time as mutually agreed by Wells Fargo and Correspondent. Correspondent has three options from which to choose to compensate Wells Fargo for the Services provided. These options are:

*Fee Compensation:* Correspondent's Account is debited for Service fees;

*Balance Compensation:* Average Available Balances, adjusted for reserves at Wells Fargo's discretion, are valued at an earnings credit rate, which enables Correspondent to fully offset Service fees by maintaining a calculated balance at all times; or

*Combined Fee/Balance Compensation:* Service fees are reduced by the value of the average Available Balance maintained in Correspondent's Account calculated using the earnings credit rate. The shortfall is debited to Correspondent's Account. If the average Available Balance is negative or zero, Correspondent's Account will be debited for all Service fees in full. Any overdraft created by the debiting of Service fees will be subject to the provisions regarding Overdrafts and Overdraft Charges as set forth in this Part 2.

For all options, Service fees are detailed in the account analysis statement, which Correspondent will receive on a monthly basis.

## 2.7   Safeguarding Correspondent's Account

From time to time Wells Fargo may recommend certain fraud prevention procedures including closing Correspondent's Account and opening another Account based on actual or potential fraudulent activities. If Correspondent fails to follow these recommendations and continues to use the existing affected Account (or if Correspondent fails to follow other fraud prevention practices reasonable for Correspondent's particular circumstances and agreed to in advance by Wells Fargo) Correspondent will be precluded from asserting any claims against Wells Fargo for paying any unauthorized, altered, counterfeit or other fraudulent Check that such recommendation, for example, closing the existing Account, was likely to detect or deter. Wells Fargo is not required to re-credit Correspondent's Account and will not have any other liability for paying Items or executing payment orders or other instructions that would have been prevented by following Wells Fargo's recommendations or Correspondent's practices agreed to by Wells Fargo in advance.

# Part 3: Electronic Transfers

## 3.1   Authorization and Security Procedures

All payment orders or amendments and cancellations thereof must be transmitted to Wells Fargo in compliance with Security Procedures. Wells Fargo will verify the authenticity of payment orders pursuant to the Security Procedures. Any payment order authenticated under the Security Procedures will be the authorized order of Correspondent, if Wells Fargo accepts the payment order in good faith. Correspondent will disclose Security Procedures only to its Authorized Representative(s) and establish controls to protect Security Procedures from unauthorized disclosure. If Correspondent knows or suspects that Security Procedures have become known to persons other than Authorized Representatives or otherwise compromised, Correspondent must immediately notify Wells Fargo, and Wells Fargo will, if feasible, change Security Procedures as soon as commercially, reasonably possible under the circumstances, The following Security Procedures will be used to verify that Correspondent is the originator of a payment order, or is the sender of other communication requesting an amendment, cancellation or other action regarding a payment order for the communications systems listed below:

- For SWIFT, the SWIFT Authentication procedures in accordance with the SWIFT User Handbook as amended from time to time.

- For telex, Wells Fargo's test key.

- For Web based systems, the Security Procedures set forth in the applicable Service Description between Wells Fargo and Correspondent.

Correspondent agrees that the above described Security Procedures are commercially reasonable in light of Correspondent's circumstances and the type, value and frequency of the payment orders Correspondent will request. Signature verification alone is not a security procedure under Article 4A of the Uniform Commercial Code and will not be utilized by Correspondent as a substitute for any of the Security Procedures offered by Wells Fargo to Correspondent to submit payment orders to Wells Fargo.

## 3.2  Payment Orders

Correspondent may instruct that Wells Fargo debit Correspondent's Account and transfer funds for Correspondent's account, to other financial institutions, or pay third parties at other domestic or foreign financial institutions. If Correspondent sends a payment order to Wells Fargo that instructs Wells Fargo to debit an account other than Correspondent's own, Correspondent hereby represents and warrants that Correspondent has the authorization to debit the account from the legal account holder and that Wells Fargo is entitled to rely on Correspondent's representation and act on such payment order. Payment orders will be transmitted to Wells Fargo in accordance with the terms set forth herein. Correspondent must select and advise Wells Fargo of the means Correspondent will use to communicate payment orders, which may include SWIFT, telex and Wells Fargo's Web based systems. Correspondent is responsible for the accuracy and completeness of the information in a payment order as well as the accuracy and completeness of any related documentation provided to Wells Fargo by Correspondent. Failure to provide accurate and complete information may result in a payment order's rejection or delay, actions for which Wells Fargo is not liable.

## 3.3  Payments Involving Currency Exchange

For payment orders of US Dollars to a foreign country, the beneficiary's bank may elect to pay the beneficiary in foreign currency at the beneficiary's bank's rate of exchange. Payment orders in foreign currency are converted at Wells Fargo's then current market rate for the applicable foreign currency. If a payment order is successfully cancelled or amended, any refund of currency resulting from such cancellation or amendment will be in US Dollars. Refunds of foreign currency orders will be converted at Wells Fargo's then current market rate for US Dollars. Correspondent bears all risk of loss due to fluctuation in the rate of exchange.

## 3.4  Execution of Payment Orders

Upon receipt of a payment order from Correspondent authenticated in accordance with Security Procedures contained herein Wells Fargo is authorized to debit Correspondent's Account or such other account as directed and transfer or pay funds upon the value date. Wells Fargo is authorized to act on any instructions, including amendments and cancellations of prior payment orders, received, in accordance with Security Procedures, as described herein. Duplicate payment

orders initiated by Correspondent may be acted upon by Wells Fargo without responsibility. Execution of payment orders is at Wells Fargo's sole discretion, including, without limitation, its sole discretion not to execute a payment order if at any time the then real time actual collected balances in the Account are not sufficient. Correspondent may not send payment orders more than ten (10) calendar days in advance. Wells Fargo may use any means, intermediaries or funds transfer systems which may have operating rules governing the execution of payment orders to process the payment order as Wells Fargo, in its sole discretion, will determine. Wells Fargo may handle payment orders received from Correspondent and other customers in any order selected by Wells Fargo. Wells Fargo will not accommodate a request from Correspondent to deliver a payment order at or before a specific time and will not be liable for any loss resulting from the failure to do so. Wells Fargo is not liable for any losses arising from a conditional payment order.

## 3.5  Use of Identifying Numbers

If a payment order describes the beneficiary inconsistently by name and account number, payment may be made on the basis of the account number even if the account number identifies a party different from the named party. If a payment order describes a participating financial institution inconsistently by name and identification number the identification number may be relied upon as the proper identification of the financial institution.

## 3.6  Cancellation and Amendment of Payment Orders

When Wells Fargo executes a payment order, Wells Fargo cannot cancel or amend the payment order. If Correspondent requests cancellation or amendment of an executed payment order, Wells Fargo will make a commercially reasonable attempt to cancel or amend, but this may require the consent of third parties. In no event will Wells Fargo have any liability for the failure of any such attempted cancellation or amendment. Correspondent is not entitled to a refund or reimbursement of any fees, including, without limitation, repair fees, paid to Wells Fargo or any third party related to any payment order that is subsequently cancelled or amended. Correspondent is liable to Wells Fargo for any fees imposed by Wells Fargo or any third party related to any requested cancellation or amendment, including, but not limited to, cancellation or amendment fees, whether or not such amendment or cancellation request is successful.

### 3.7   Cut-off Times

For same day delivery, payment orders must be received before the cut-off time for funds transfers on a Business Day as established by Wells Fargo from time to time. Payment orders or related requests received after the cut-off time or on a non-Business Day will be treated as received by Wells Fargo on Wells Fargo's next funds transfer Business Day. Wells Fargo will make reasonable efforts to execute all payment orders received prior to the cut-off deadlines.

# Part 4: Check Services

### Check Disbursements
### 4.1   General Provisions

Wells Fargo provides Check disbursement Services only in connection with Correspondent's Account. In this Part 4, Account, unless otherwise expressly stated, is limited solely to Correspondent's demand deposit Account. Checks are the only Items that can be disbursed through Correspondent's Account; promises to pay such as negotiable promissory notes or negotiable securities are not Checks. Checks drawn on an Account will be debited on the date each Check is presented to Wells Fargo.

### 4.2   Check Stock

Unless Correspondent agrees to follow the procedures set forth in this Section, Wells Fargo requires Correspondent to order Check stock through Wells Fargo to avoid procuring Check stock that does not meet Wells Fargo's specifications.

In the event that Correspondent elects not to order Check stock through Wells Fargo, Correspondent must follow Wells Fargo's detailed instructions on the required formats for Check stock. Correspondent must send a sample of Check stock purchased through a source other than Wells Fargo for inspection prior to usage. If Check stock purchased through a source other than Wells Fargo does not pass inspection, Correspondent must pay all associated costs, including the cost of reprinting.

Checks drawn on Wells Fargo should be fully MICR (Magnetic Ink Character Recognition) encoded and include MICR-printed serial numbers. Correspondent assumes all risk, including delays in posting, associated with Checks that are not fully MICR encoded. Correspondent agrees that when Wells Fargo pays or takes a Check for collection, Wells Fargo may disregard

all information on the Check other than any information encoded onto the Check in magnetic ink according to general banking standards, whether or not that information is consistent with other information on the Check. Correspondent assumes all risks associated with Checks it issues that have duplicate serial numbers, and Wells Fargo will not be liable for such transactions.

### 4.3   Advice of Issuance

Correspondent must promptly send to Wells Fargo an advice of issuance either by authenticated SWIFT MT110 or tested telex for each Check issued that falls within certain amount specifications established by Wells Fargo from time to time and communicated to Correspondent. Each advice of issuance must include all the following specific details about the Check being issued by Correspondent: (i) the issue date of the Check; (ii) the Dollar amount of the Check; (iii) the Check number indicated on the Check; and (iv) the Account number on which the Check is drawn. Wells Fargo may choose to return a Check for which an appropriate advice of issuance was not received. If Correspondent fails to send an advice of issuance, if the information on the advice of issuance is incorrect, or if the information on the advice of issuance does not coincide with the information on the Check, and if any of these results in a loss, such loss must be borne by Correspondent. Correspondent authorizes Wells Fargo to rely on the advice of issuance for authorization to pay a Check

### 4.4   Payment/Nonpayment of Checks

Checks drawn on Correspondent's Account may be returned by Wells Fargo unpaid for any reason permitted by Law. Wells Fargo may refuse to pay or may impose a special fee for any Check drawn against Correspondent's Account or used to withdraw funds from Correspondent's Account if the Check is not on a form Wells Fargo has approved, if the transaction evidenced by the Check is made in a manner not specifically authorized for Correspondent's Account, or if the Check or the transaction evidenced by the Check is otherwise made in any manner in contravention of Law or Wells Fargo's policies and procedures. If at any time the then real time actual collected balances are not sufficient, Wells Fargo may, at its sole discretion, return the Check or elect to pay such Check and overdraw the Account. Wells Fargo may pay Checks drawn upon Correspondent's Account in any order determined by Wells Fargo, even if (i) paying a particular Check results in an insufficient balance in Correspondent's Account to pay one or more Checks that otherwise could have

been paid out of Correspondent's Account; or (ii) using a particular order results in the payment of fewer Checks or the imposition of additional fees.

#### 4.5   Truncation of Checks/Payment of Substitute Checks

Checks that have been lost or truncated during the collection process may be reconverted into Substitute Checks or other replacement documents. Under US Federal Law, Wells Fargo is required to accept Substitute Checks with warranties as the legal equivalent of the original, and Wells Fargo will pay and charge against Correspondent's Account such Substitute Checks. Correspondent agrees that Wells Fargo may at its sole discretion pay and charge against Correspondent's Account photocopies of Checks, image replacement documents, electronic Checks or other paper or electronic replacements of any original Checks that do not constitute Substitute Checks, if they appear to be replacements for properly drawn and authorized Checks. Correspondent agrees to allow any Substitute Check or indemnified copy to serve as the original for all purposes, including charging Correspondent's Account.

#### 4.6   Stop Payments

Correspondent may ask Wells Fargo to stop payment of a Check drawn on Correspondent's Account. If the Check has not already been paid, Wells Fargo will stop payment subject to the conditions set forth in this Section. Correspondent must request stop payments on Checks drawn on the Account by authenticated SWIFT MT111 message or by tested telex. To be effective, the stop payment request must provide the exact: (i) amount of the Check; (ii) Check number; (iii) issue date of Check; (iv) payee; (v) complete Account number on which the Check is drawn; and (vi) other information as reasonably requested by Wells Fargo. If the information Correspondent gives Wells Fargo is not correct or complete or if Correspondent does not provide Wells Fargo the information required above and any other information reasonably requested about the Check, Wells Fargo will not be responsible for effecting the stop payment. Wells Fargo also cannot be responsible if Wells Fargo is not able to identify the proper Check because: (i) Correspondent has issued more than one Check with the same serial number; or (ii) Correspondent has generated a Check in any manner which does not produce a MICR encoded Check number on the Check. Wells Fargo is entitled to a reasonable period of time within which to effect the stop payment order. For purposes of a stop payment order under these Terms & Conditions, a reasonable

time means until the end of the Business Day following the Business Day on which the stop payment order was actually received by Wells Fargo. Stop payment orders are valid for six months.

#### 4.7   Stale, Time-Dated, and Post-Dated Checks

Wells Fargo maintains the option either to pay or to dishonor any stale Check (i.e., a Check that is more than six (6) months old) upon presentation to Wells Fargo. Wells Fargo is not responsible for detecting time-dated Checks (i.e., Checks stating that they are not valid after a certain date or beyond a certain period of time). Correspondent agrees that Wells Fargo will not be liable to Correspondent for charging Correspondent's Account after the date or period stated on an otherwise properly payable time-dated Check. Correspondent further agrees that Wells Fargo is not bound by any time limitation or restriction that Correspondent may place on any Check presented for payment against Correspondent's Account. If any Check has not been paid within the time Correspondent expects, Correspondent agrees that Correspondent's sole method to prevent payment is to place a stop payment order, as provided herein. Wells Fargo is not responsible for detecting a postdated Check (i.e., a Check bearing a date later than the actual calendar date) nor is Wells Fargo responsible for charging Correspondent's Account before the indicated date on a properly payable but post-dated Check.

### Cash Letter
#### 4.8   Dollar Cash Letter

Wells Fargo provides Dollar cash letter Services to act as Correspondent's clearing agent of Checks payable in Dollars and drawn on banks in the US. Wells Fargo agrees to receive Dollar cash letter deposits through Wells Fargo's image cash letter Services or directly through paper shipments from Correspondent delivered to Wells Fargo at its designated offices. Check classes currently eligible for deposit through Dollar cash letter include: (i) Dollar commercial Checks drawn on banks in the US; (ii) Dollar bank drafts payable in the US; (iii) Money orders issued by banks in the US; (iv) International Postal Money Orders issued by the US Postal Service; and (v) Dollar Travelers Checks drawn on institutions in the US.

The image cash letter Services provide the ability to capture images of Checks remotely, create deposits, and then transmit those deposits to Wells Fargo for credit to an Account.

(A) If Correspondent uses Wells Fargo's software for remote image capture: the parties agree that: (i) Wells Fargo will supply Correspondent with software to capture images and create deposits at Correspondent's location(s); (ii) Correspondent will be responsible, using the software provided, for the balancing and transmission of data to Wells Fargo; and (iii) Correspondent must obtain appropriate scanning equipment, which must adhere to standards and requirements established by Wells Fargo;

(B) If Correspondent uses its equipment and software for remote image capture, the parties agree that: (i) Correspondent must create and transmit files directly to Wells Fargo in a predefined format; (ii) Correspondent will be responsible for performing all imaging, data correction, image quality analysis and reconcilement with this option; (iii) transmission and image formats must adhere to Wells Fargo's specifications and quality standards which may be amended from time to time; (iv) Correspondent must ensure ongoing compliance with Wells Fargo's specifications and quality standards by using image quality tools acceptable to Wells Fargo; and (v) Correspondent assumes all responsibility for security, image quality and data integrity.

Wells Fargo may reject any file transmission that does not conform to its transmission format and/or image standards.

### 4.9   Foreign Currency Cash Letters

Wells Fargo provides Services to act as Correspondent's clearing agent for Checks payable in currencies other than Dollars under a Check clearing arrangement. A list of then eligible currencies and countries is provided at Service implementation and thereafter is subject to change without notice. Correspondent may also include Dollar Checks drawn on a bank or a financial institution in selected foreign countries in Correspondent's foreign currency deposit for processing under a cash letter arrangement. Checks presented are subject to the Laws and the clearing and return rules of the country in the location in which the payor bank is operating. Wells Fargo agrees to process foreign currency Checks on a cash letter basis for Dollar equivalent credit to Correspondent's Account converted at Wells Fargo's then buying rate for the foreign currency. Upon request Wells Fargo makes available daily foreign exchange rates for each currency accepted under foreign currency cash letter Services.

### 4.10  Cash Letter Exclusions

Cash letter Services are only for Checks, and Wells Fargo does not have any liability to process or account for any other Item, thing or object, including coin and currency, (in this Section collectively referred to as "Other Materials") in a cash letter. Further, Wells Fargo at its sole discretion may determine not to process any Check, class of Checks or other Items submitted under cash letter Services, and Correspondent agrees not to submit any Check, class of Checks or other Items advised to Correspondent as excluded from Wells Fargo's cash letter Services (in this Section called an "Ineligible Check.") Correspondent is responsible for excluding all Ineligible Checks and/or Other Materials when using this Service and must indemnify Wells Fargo for any losses suffered as a result of processing an Ineligible Check. If Correspondent remits any Ineligible Check or Other Materials in violation of this requirement, Wells Fargo assumes no responsibility, may reject any Ineligible Check and is not responsible for the safekeeping of or the accounting for Other Materials. Correspondent represents and warrants to Wells Fargo that it will not submit more than one image of the same Check to Wells Fargo or any other bank or entity for processing. Correspondent must not remit deposits containing sequentially numbered Checks where the total value of the series exceeds any amount advised by Wells Fargo from time to time, or deposit any Check, regardless of value, that Correspondent suspects may involve any transaction that is illegal, including, without limitation, money laundering or terrorist financing or appears to involve any transaction that Wells Fargo has advised Correspondent is not an acceptable transaction for Wells Fargo.

### 4.11  Availability of Funds

For cash letter deposits received prior to processing cut-off deadlines established by Wells Fargo, Correspondent will receive availability of all Checks in accordance with Wells Fargo's predetermined collection schedules. Any imaged cash letter deposit is considered to have been received for processing by Wells Fargo upon Wells Fargo's acknowledgement of receipt of the deposit transmission. Wells Fargo will acknowledge the receipt time of Correspondent's transmission via email or XML transmittal or other mutually agreed channel.

### 4.12 Method of Clearing

Wells Fargo will choose the agent and/or method for clearing original physical Checks, including conversion into an image or reconversion into a Substitute Check where permitted by Law. Check images and Substitute Checks submitted under Dollar cash letter Services must meet all industry standards for quality and format, including, as appropriate, standards established by the American National Standards Institute, the Board of Governors of the Federal Reserve System, and clearinghouse rules, and must be sufficient for Wells Fargo to comply with all Check 21 requirements when creating a Substitute Check. Any Checks submitted to Wells Fargo under cash letter Services are subject to the transfer and presentment warranties under the Uniform Commercial Code and Regulation CC adopted by the Board of Governors of the Federal Reserve System of the US. Checks that Correspondent writes or deposits may be automatically processed and/or converted into electronic images (truncated) during the Check collection and return process, and to the extent that Correspondent fails to follow the instructions that Wells Fargo provides in order to insure that critical data is imprinted on the Check, Wells Fargo will not be liable for the failure of critical data printed or written on the Check to survive truncation or to survive the use of check carriers.

### 4.13 Deposit Preparation for Security, Retrieval, Accurate Credit

Wells Fargo is not responsible for any loss related to cash letters for which deposit tickets are missing or improperly completed. Wells Fargo will not be liable for the use of any incorrect foreign exchange rate listed on Correspondent's Foreign Currency Cash Letter deposit ticket.

Correspondent must maintain appropriate records of the front and back of each Check deposited to enable prompt reconstruction of documents in the event of loss or damage in transit or transmission. For Checks that are transmitted to Wells Fargo through the use of image cash letter Services Correspondent has sole responsibility to safe keep and/or destroy each original Check that is used to create the images and MICR information. The original Check associated with each image transmitted to Wells Fargo should be retained by Correspondent in a secure fashion for a period of time determined by Correspondent through consultation with its legal counsel and a review of Correspondent's

needs. All Checks should be stored and secured at all times to prevent inappropriate access. Those files which Correspondent's policies and procedures deem inactive should be stored at a secure facility and catalogued with a retention date to permit orderly retrieval. Stored records should undergo a periodic review to determine an appropriate destruction schedule. Checks, upon destruction, must be destroyed using a mechanism that ensures complete destruction of the original.

### 4.14 Endorsement

Wells Fargo requires Correspondent to protect against unauthorized negotiation by properly and legibly endorsing all Checks deposited through cash letter Services. The endorsement should be placed in black or dark ink on the back of each Check. Wells Fargo recommends the following endorsement format:

PAY TO THE ORDER OF WELLS FARGO BANK, N.A.
ALL PRIOR ENDORSEMENTS GUARANTEED
FOR [insert Correspondent name]
Correspondent's Complete Account Number
REF #: _____

Optional information may be included provided the inclusion of such information does not interfere with the readability of the endorsement. If an alternate Account number, other than the original Account to which the deposit was made, is to be used for return Check processing, such instructions and the alternate Account number must be included on the endorsement of each Check. Wells Fargo will employ commercially reasonable efforts to follow Correspondent's instructions in debiting returned Checks to Correspondent's alternate Account.

### 4.15 Cash Letter Total Adjustments

Cash letters will be credited for the amount indicated on the deposit ticket. Errors in the calculation of the total value of the deposit will be separately adjusted by debiting or crediting the Account under advice. Correspondent is responsible for reimbursing Wells Fargo for the amount of any claims for adjustments related to Checks credited to Correspondent's Account. Such amounts will be charged back to Correspondent's Account, even if they create an overdraft, and are immediately due and payable by Correspondent to Wells Fargo. Correspondent may elect to receive automatic SWIFT/telex advices for adjustments of any amount in addition to their inclusion on Correspondent's Account statements.

### 4.16  Dollar and Foreign Currency Check Collection

At its sole discretion, Wells Fargo provides Dollar and foreign currency Check collection Services. Any Check received for collection will not be credited to Correspondent's Account unless and until Wells Fargo has received payment for the Check. Wells Fargo will, as agent for Correspondent, send such Checks through its customary collection channels. All fees associated with the collection of Checks will be deducted from the proceeds of the transaction prior to credit to Correspondent's Account. Checks are collected under prevailing Law and applicable clearing and return rules.

### 4.17  Return Check Processing

Correspondent acknowledges that all deposited Checks are credited with recourse and subject to return in accordance with applicable Law and clearing and return rules of the location in which the payor bank is operating. When any Check in whatever currency for which Correspondent has received credit in Correspondent's Account is returned to Wells Fargo with a claim for refund or other damages for any reason, including, but not limited to, alteration, forged or unauthorized endorsement, or otherwise not properly payable, or for which a warranty claim is made, Wells Fargo will, without notice, debit any Account, whether demand deposit or otherwise, of Correspondent for the amount of such claim. Any returned Check payable in foreign currency will be debited using Wells Fargo's then current selling rate for the applicable foreign currency. Wells Fargo will provide advice by authenticated SWIFT or tested telex of any unpaid Check. Wells Fargo will not automatically redeposit any returned Check under any circumstance in the cash letter Services. Any Check returned may be returned as an original physical Check or in the form of a Substitute Check or image, wholly at the discretion of the drawee bank and/or Wells Fargo.

## Part 5: Trade Services

### 5.1  Letters of Credit

Wells Fargo provides letter of credit Services in accordance with UCP600, and the International Standby Practices, International Chamber of Commerce Publication Number 590 or any subsequent revision or restatement thereof which may be adopted by the International Chamber of Commerce and accepted by Wells Fargo for use. All letter of credit charges and associated assessments will be accumulated and charged to Correspondent's Account, unless otherwise indicated, on the date of payment/acceptance or at expiration. Communications regarding letters of credit will be via authenticated SWIFT or tested telex, or by original letter of credit mailed via courier and authenticated by Security Procedures approved by Wells Fargo.

### 5.2  Bank-to-Bank Reimbursements

Wells Fargo only provides reimbursement Services in accordance with URR725. Authorizations, Amendments, and Claims can be sent via authenticated SWIFT, tested telex, courier or through the mail. Correspondent agrees that notwithstanding anything to the contrary provided in any Authorization or Amendment received by Wells Fargo from Correspondent all will be subject to URR725. Correspondent's transmission to Wells Fargo of Authorizations and Amendments even though they do not specify whether or not URR725 applies will constitute Correspondent's agreement that URR725 must apply to such Authorizations and Amendments. Wells Fargo is not responsible for authenticating any Claim received. Correspondent agrees that Wells Fargo may act upon a Claim received by Wells Fargo without any responsibility or liability on Wells Fargo's part for the authenticity of such Claim.

### 5.3  Documentary Collections

Wells Fargo at its sole discretion acts as collecting bank for documentary collections. Irrespective of any language to the contrary in, or the absence of any provision in, any collection letter received from Correspondent, all documentary collections are subject to URC522. Each Item presented for collection if required must be endorsed in accordance with the provisions set forth in Part 4 hereof. When any collection Item is returned to Wells Fargo with a claim for refund because it bears an alteration, a forged or unauthorized endorsement, or is otherwise not properly payable, Wells Fargo reserves the right to either charge Correspondent's Account for the amount of such claim or otherwise recover from Correspondent the amount Wells Fargo deems to be the Obligation due to such claim.

### 5.4  Export Bill Receivables

Wells Fargo may provide export bill receivables Services upon Correspondent's request. When Correspondent forwards export bill receivables for payment, it appoints Wells Fargo as its agent for the purposes of presentation of documents and

reimbursement claims, tracing for, and receipt of funds under letters of credit and documentary collections. When acting as Correspondent's agent, Correspondent acknowledges that Wells Fargo is not a party to the underlying transactions and therefore is not subject to any International Chamber of Commerce rules. Wells Fargo is not responsible for authenticating any reimbursement claim or export documents received from Correspondent when Wells Fargo undertakes export bill receivables Services. Wells Fargo agrees to deliver a claim or documents received from Correspondent promptly to the reimbursing or paying bank to enable Correspondent to obtain payment or acceptance. Wells Fargo will provide Correspondent with updates on outstanding transactions upon receipt of status information from the paying or reimbursing banks. Status updates are delivered to Correspondent via pre-approved means (SWIFT, telex or Web based systems) without any responsibility or commitment on Wells Fargo's part.

## Part 6: Courier Services

### 6.1 General Provisions

Wells Fargo may arrange courier services from third party vendors for trade and Services related to Items offered by Wells Fargo requiring delivery of physical documents. When arranging for any courier service: (i) Wells Fargo assumes no responsibility for Packages with respect to pick-up or while en route including, but not limited to, security delays and customs clearance, or to or from Wells Fargo's designated operations center; (ii) Wells Fargo is not responsible for the actions, omissions and/or negligence of the courier with respect to failure to pick up the Package or loss of the Package or damage to its contents while in the possession of courier, or any late delivery or non-delivery of the Package; (iii) Wells Fargo may authorize a courier to choose an alternate means of carriage or route on a temporary basis without first consulting Correspondent and such action will not alter the limitation of Wells Fargo's liability; (iv) Wells Fargo will not be deemed to have received any Package until the Package has physically been received by Wells Fargo and its contents verified by Wells Fargo at the address of which Wells Fargo notifies Correspondent from time to time; (v) Wells Fargo will not be liable for any fluctuation in foreign exchange rates or interest rates due to courier delays in transit of any Package; (vi) For any Package lost by Wells Fargo, Wells Fargo will only be liable for assisting Correspondent with

reconstruction and further processing of documents contained in a lost Package.

### 6.2 Lost Checks

When Checks or Packages containing Checks are lost in transit, the following provisions apply:

(i) If a cash letter shipment is lost in transit between Correspondent and the receiving center for Wells Fargo, Wells Fargo agrees to provide Correspondent with provisional credit within ten (10) Business Days after its receipt of two legible copies (front and back) of each of the Checks which were lost; (ii) Legible copies, properly indemnified, should be received by Wells Fargo not later than forty-five (45) calendar days after the original Check(s) was/were lost; (iii) Wells Fargo will then, for a period of six (6) months commencing on the date Correspondent's Account is provisionally credited, initiate an effort to collect on the copies of the original Checks; (iv) Correspondent will retain use of the full value of the Check(s) (subject to normal returns) during the six (6) month period; and (v) At the end of the six (6) month period, Wells Fargo will debit Correspondent's Account for the full value of any of the uncollected copies and will provide Correspondent with a list of all of the uncollected copies.

### 6.3 Lost Trade Documents or Items

When trade related Packages or trade related documents, including Items, are lost in transit, the following provisions apply: (i) if a shipment carrying letters of credit, documentary collections or export bill receivables, including any Items, is lost in transit between Correspondent and the issuing or paying bank, or between Correspondent and Wells Fargo, Wells Fargo agrees to assist Correspondent with replacement or reconstruction of such documents and/or Items; (ii) provided that Correspondent delivers front and back photocopies of documents and/or Items to Wells Fargo within the number of Business Days notified as necessary by Wells Fargo from receipt of notice of lost documents and/or Items, Wells Fargo will employ commercially reasonable efforts to recover all costs of obtaining replacement originals from the issuer(s),and to pass on any costs recovered to Correspondent; and (iii) upon receipt of reconstructed or replacement documents and/or Items, Wells Fargo will re-deliver such to the issuing or paying banks to enable Correspondent to obtain payment therefore.

# Part 7: Miscellaneous

## 7.1   Assignment of Terms & Conditions

These Terms & Conditions may be assigned by Wells Fargo at any time. Neither these Terms & Conditions nor any Account nor any Services provided pursuant to these Terms & Conditions may be assigned or transferred by Correspondent, except in connection with a merger and with prior written approval by Wells Fargo. An assignment or transfer by Correspondent will not affect Wells Fargo's rights and remedies under the Terms & Conditions, including Wells Fargo's right of termination or modification of all or any portion of the Services provided to Correspondent under the Terms & Conditions.

## 7.2   Conflicts/Disputes Involving the Account and Services

If Wells Fargo receives an actual or potential claim from a third party regarding Correspondent's Account, or conflicting instructions or claims from Authorized Representatives, Wells Fargo may, at Wells Fargo's discretion and without liability to Correspondent, choose not to disburse any funds from Correspondent's Account until Wells Fargo receives consistent instructions from all parties or a court order. Wells Fargo may without liability to Correspondent close the Account and issue a Check made payable to Correspondent, make an electronic transfer in favor of Correspondent or interplead the funds into court.

## 7.3   Setoff and Security Interest

If Correspondent acting in any capacity, including, without limitation, depositor, borrower, guarantor, judgment creditor or otherwise, including, without limitation, in connection with any payment or any other Obligation owed to a financial institution acquired by Wells Fargo, ever owes any Obligation to Wells Fargo or any Associate Bank, and it becomes due, Wells Fargo may Setoff and use and apply the funds from one or more of Correspondent's Account(s) to pay the Obligation without prior notice to or demand upon Correspondent. If the Obligation and the Account are in different currencies, Correspondent agrees that Wells Fargo may use the currency of the Account to purchase the currency of the Obligation at the then spot rate in order to Setoff. Wells Fargo may accelerate the maturity of any Account and may accelerate and/or treat any Obligation, including, without limitation, any contingent Obligation, as then immediately due and payable in order to maximize Wells Fargo's rights

under any Setoff. Wells Fargo may use the Account to pay the Obligation even if the withdrawal results in an interest penalty or the dishonor of Checks or the rejection of electronic payment orders. In the case of Correspondent's head office and its branch(es), if any, maintaining Accounts with Wells Fargo, Correspondent agrees on behalf of its head office and all of its branches that Wells Fargo may use any Account to satisfy any of Correspondent's Obligations whether the Obligations are that of head office or a branch. Wells Fargo may restrict Correspondent's right to withdraw funds from any of Correspondent's Accounts, whether head office or any branch, in connection with Wells Fargo's exercise, or anticipated exercise, of its right of Setoff. Correspondent grants Wells Fargo and all Associate Banks a continuing charge, lien and security interest in and right of Setoff against all of Correspondent's right, title and interest in and to all Accounts and other deposits, accounts and investments with any Wells Fargo offices or any Associate Bank wherever located to secure payment of Correspondent's Obligations to Wells Fargo or to any Associate Bank acting in any capacity. The security interest and right of Setoff granted by these Terms & Conditions are consensual and are in addition to any other security interest or right of Setoff that Wells Fargo or any Associate Bank may have. Any pledge or assignment by Correspondent to third parties of Accounts for security purposes remains subject to Wells Fargo's and all Associate Banks' right of Setoff and security interest, which must take priority over any such grant of a security interest to a third party. To the extent any of the funds to be Setoff are entitled to any exemption from execution, levy, attachment, garnishment, seizure or other legal or equitable process, then, to the maximum extent allowed by Law, Correspondent hereby knowingly, affirmatively and unequivocally waives such exemption and consents to Wells Fargo's or any Associate Bank's Setoff against such funds as contemplated by these Terms & Conditions. All payments received by Setoff or by exercise of Wells Fargo's security interest may be applied first to Wells Fargo's fees, late charges, costs and expenses which Correspondent is obligated to pay pursuant to the terms hereof, then to accrued and unpaid interest on amounts outstanding and then to principal, or such payments may be applied in such other order as Wells Fargo in its sole discretion will determine. Wells Fargo may, in its sole discretion, reverse any Setoff previously effected and reinstate any of Correspondent's Obligations, including, without limitation, any overdraft, that was previously satisfied as a result of such Setoff. Any such reversal will have

retroactive effect as if the Setoff had not occurred, and all of Wells Fargo's rights and remedies under these Terms & Conditions and otherwise, including Wells Fargo's security interest, which will continue without interruption from the original date of creation in such funds, will remain in full force and effect.

### 7.4   Confidentiality

Each party agrees it will not disclose any information received from the other party and will employ all reasonable measures to avoid unauthorized disclosure of the other party's information in breach of these Terms & Conditions, consistent with the measures that the receiving party uses to protect its own most sensitive confidential information. Absent any agreement specifically to the contrary, Wells Fargo, its Associate Banks and their other affiliates reserve the right to exchange among themselves information about Correspondent and its Accounts, to disclose such information to subcontractors and agents, and to report any relevant information to credit reporting agencies. Wells Fargo may be required to disclose such information as required by legal and regulatory process or to prevent illegal or fraudulent activities. Wells Fargo endeavors to protect the privacy of personal information about individuals who are employees, officers and representatives of, or investors in, Correspondent (in this Section 7.4 on Confidentiality hereinafter referred to as "individuals"). A description of the types of data Wells Fargo may collect about Correspondent and the individuals, the purposes for which the data is collected, and how the data may be transferred, is available in the Privacy Notices. By accepting Services under these Terms & Conditions or by opening an Account, to the extent permitted by Law Correspondent consents on behalf of itself and the individuals to the terms of the applicable Privacy Notice, and represents to Wells Fargo that if under local Law a consent to share the personal information of any of the individuals is required, Correspondent has obtained same. By accepting Services under these Terms & Conditions or by opening an Account, Correspondent authorizes Wells Fargo to record telephone or other conversations between it by its individuals and Wells Fargo and has obtained the consent of Correspondent's individuals to record telephone or other conversations between Wells Fargo and any of the individuals. All decisions to record conversations, and to preserve or destroy such recordings, will be within Wells Fargo's sole discretion. Wells Fargo will incur no liability by reason of its recording or not recording such conversations, or

preserving or destroying such recordings. The authority granted by this provision will survive the termination of these Terms & Conditions, termination of any Services or closing of an Account.

### 7.5   Enforcement of Electronic Instruments and Agreements

Neither party will contest the admissibility of documents or records simply because they are in electronic form, including, without limitation, in SWIFT message form. Each party also accepts that records and documents in non paper or electronic form, including, without limitation, in SWIFT message form, will have the same force as paper copies (if any), and that it will be legally bound by them as if in writing with original signature. Any Item, agreement, instrument or other document with Electronic Signature or under authenticated procedures or through a secure Wells Fargo web site or system will have the same force and effect as if it were bearing an original signature. As used in this Section: (i) The term "electronic" means relating to technology having electrical, digital, facsimile, magnetic, wireless, optical, electromagnetic, or similar capabilities; and (ii) The term "electronic record" means a contract or other record created, generated, sent, communicated, received, or stored by electronic means.

### 7.6   Termination

Correspondent or Wells Fargo may close any Account and terminate these Terms & Conditions, and unless otherwise provided specifically in writing, terminate any Service at any time without advance notice. Correspondent will receive any Available Balance in its Account within a reasonable period of time after it is closed; provided Wells Fargo has the right to Setoff any funds necessary to satisfy any outstanding Obligations of Correspondent to Wells Fargo or to any Associate Bank. In addition to Wells Fargo's right to return any Available Balance in Correspondent's Account after a reasonable time, Wells Fargo may require that Correspondent maintain a reasonable reserve amount in the Account or as security in order to satisfy any Obligation not yet due, including, without limitation, any chargeback to the Account which may occur after the Account is closed. Correspondent is liable for all returned Checks or other Items, drawee bank claims and all other Obligations due to Wells Fargo, even if Correspondent's Account is closed. Wells Fargo may return unpaid any Items presented on a closed Account. Rights and responsibilities, which by their nature would continue beyond the termination of these Terms &

Conditions, including the rights and responsibilities set forth in this Section will survive the termination of these Terms & Conditions, termination of any Services and closing of the Account. Upon termination of any Account, Services or these Terms & Conditions, Wells Fargo or any Associate Bank may accelerate any Obligations then owing to Wells Fargo hereunder or under any other instrument or agreement evidencing an Obligation of Correspondent to Wells Fargo or to an Associate Bank.

### 7.7   Applicable Laws, Rules, and Guidance

These Terms & Conditions will be governed by and construed in accordance with the Laws of the US and the State of New York, including (without limitation) Articles 3, 4, 4A and 5 of the Uniform Commercial Code, as amended by agreement between Wells Fargo and Correspondent, and New York CLS Dr & Cr § 151, which are all incorporated herein by reference and made a part hereof. Accounts which are inactive for a specified period of time may be subject to escheat under state Law. Accounts are subject to attachment, levy, seizure, and garnishment Law. Accounts and Services provided in connection with these Terms & Conditions are also governed by applicable rules of and Operating Circulars issued by the Board of Governors of the Federal Reserve System of the US, the rules of clearing houses and similar associations to which Wells Fargo may belong, funds transfer system rules, publications of organizations, including without limitation BAFT-IFSA, the Clearing House Association L.L.C. and the International Chamber of Commerce, and general US commercial bank practices applicable in connection with the Account and the Services.

### 7.8   Compliance with Law

Wells Fargo is a bank organized and existing under the Laws of the US, and intends to comply with all Laws of the US applicable to it in any of its locations, including without limitation the USA PATRIOT Act, the Trading with the Enemies Act, the International Emergency Powers Act, regulations of the United States Department of the Treasury and the Office of Foreign Assets Control, and in its foreign locations to comply with all applicable Laws of the host country. Correspondent acknowledges that Wells Fargo's compliance with Laws to which it is subject may affect the transactions Correspondent may conduct with, or through, Wells Fargo and may require that Correspondent provide or certify information to Wells Fargo about itself or any entity or class of entities transacting payments or other business through

Correspondent's Account or through Correspondent's use of other Services.

**USA PATRIOT Act Notice:** To help the US government fight the funding of terrorism and money laundering activities, US Federal Law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

### 7.9   Waiver of Jury Trial and Dispute Resolution

Correspondent hereby irrevocably submits to the jurisdiction of the courts of the Borough of Manhattan, New York City, in the State of New York, USA or the Federal courts located therein over any action or proceeding arising out of or relating to these Terms & Conditions and irrevocably agrees that all claims in respect of such action or proceeding may be heard or determined in such courts.

No legal proceeding may be commenced against Wells Fargo hereunder except in such foregoing New York located courts and unless Correspondent has given Wells Fargo timely notice as required in these Terms and Conditions and such legal proceeding is commenced within two years after the action or inaction giving rise to such claim occurred or the applicable statute of limitation, whichever is earlier.

**Wells Fargo and Correspondent each knowingly, voluntarily and intentionally waive any right that they may have to a trial by jury in any litigation in any way based upon, arising out of or related to the Account, the Services, these Terms & Conditions, or the breach thereof, or any course of conduct or course of dealing by the parties related thereto. This provision is a material inducement to Wells Fargo to provide the Account and the Services referred to herein.**

At Wells Fargo's request or its written agreement any controversy or claim arising out of or relating to the Account, Services, Terms & Conditions, or the breach thereof, must be submitted to arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules before three (3) arbitrators if the amount in controversy is five (5) million Dollars or more or other currency equivalent, and to the extent permitted by the International Arbitration Rules, before one (1) arbitrator for amounts in controversy of less than five (5) million Dollars or other currency equivalent. The place of arbitration must be New York City, in the State of New York, USA and the language of the arbitration must be English.

At Wells Fargo's request or its written agreement, any disputes arising out of or in connection with products and Services that are delivered pursuant to or governed by rules or guidance published by the International Chamber of Commerce will be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. The place of arbitration must be New York, State of New York, USA and the language of the arbitration must be English.

Correspondent irrevocably consents to the service of process by personal delivery or overnight courier or registered or certified airmail, postage prepaid, of copies of the summons and complaint or other process (which must be in the English language) to Correspondent's address in Section 7.18 regarding notices or to Correspondent's agent for service of process in the USA. Nothing herein affects the right to serve process in any other manner permitted by Law or the International Arbitration Rules of the International Centre for Dispute Resolution.

### 7.10  Waiver of Notice of Dishonor

By using the Accounts and or any Service, Correspondent waives any requirement of notice of nonpayment, dishonor or protest regarding any Items credited to or charged against Correspondent's Account. For example, if an Item that Correspondent deposits is dishonored and returned to Wells Fargo, Wells Fargo may, but is not required to, notify Correspondent of the dishonor.

### 7.11  Invalidity of Contract Provisions

In the event any one or more of the provisions of these Terms & Conditions will for any reason, including under any applicable Law, be held to be invalid, illegal or unenforceable, the remaining provisions of these Terms & Conditions will remain in full force and effect.

### 7.12  Subcontractors

Correspondent acknowledges and agrees that Wells Fargo, in its sole discretion, may provide any Services through subcontractors and agents and additionally may process any transaction or provide any Service under these Terms & Conditions in any of its US or non-US locations or in any of its subcontractor or agent locations either within or outside the US. Wells Fargo will be entitled, in its sole discretion, to send any of Correspondent's information necessary to provide Services under the Terms & Conditions or any Service

Description to any location or jurisdiction, whether to a Wells Fargo location or a subcontractor location, for processing, storage or other purpose under these Terms & Conditions or under any Service Description.

### 7.13  Indemnification

Correspondent agrees to indemnify, defend and hold Wells Fargo, its successors, assigns, correspondents, directors, officers, employees, subcontractors and agents harmless from and against any and all claims, losses, damages, liabilities and expenses of any nature, including legal expenses and attorneys fees: (i) suffered or incurred by Wells Fargo by reason of or pursuant to these Terms & Conditions, or the performance of Services hereunder; (ii) arising from any claim attributable to any act or omission taken by Wells Fargo based upon reliance on: (y) any individual indicated to be authorized to act on behalf of Correspondent in any document or communication provided by Correspondent to Wells Fargo (or otherwise authorized by Correspondent) or (z) any agreed upon message format; (iii) arising from any claim or demand based in whole or in part on an action or omission of Wells Fargo resulting from a request, direction, or instruction from Correspondent; (iv) breach by Correspondent of any provision in the Terms & Conditions or any Service Description; or (v) arising from a dispute involving Correspondent's Account or the Services. Correspondent's indemnity will not be effective to relieve Wells Fargo against claims and losses arising as a direct result of Wells Fargo's own gross negligence or willful misconduct.

If any sum due from Correspondent to Wells Fargo, or any order or judgment given or made in relation hereto or thereto, has to be converted from the currency (the "first currency") in which the same is payable hereunder or under such order or judgment into another currency (the "second currency") for the purpose of (i) making or filing a claim or proof against Correspondent, (ii) obtaining an order or judgment given in any court or other tribunal or (iii) enforcing any order or judgment given or made in relation hereto or thereto, Correspondent must indemnify and hold harmless Wells Fargo from and against any losses suffered as a result of any discrepancy between (y) the rate of exchange used to convert the sum in question from the first currency into the second currency and (z) the rate or rates of exchange at which Wells Fargo may in the ordinary course of business purchase the first currency

with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order or judgment, claim or proof.

The indemnities provided in these Terms & Conditions will survive closing of any Account, termination of any Service, or termination of these Terms & Conditions.

### 7.14  Correspondent's Responsibility for Fees and Interest

In addition to any other liability of Correspondent to Wells Fargo under these Terms & Conditions or otherwise, Correspondent will be liable to Wells Fargo for all fees imposed on Wells Fargo or Correspondent by any third party related to any Services offered by Wells Fargo under these Terms & Conditions or any other agreement or arrangement between Wells Fargo and Correspondent. Such fees include, but are not limited to, intermediary bank fees, amendment fees and processing order fees.

If Correspondent fails to pay any amount when due pursuant to any extension of credit granted or in connection with Wells Fargo's delivery of any of the Services described in these Terms & Conditions, unless the parties otherwise agree in writing, Correspondent must pay interest on any overdue amount before and after judgment at a rate to be determined by Wells Fargo at its sole discretion.

### 7.15  Liability

Unless otherwise provided in these Terms & Conditions, Wells Fargo's liability, if any, will be limited to those actual damages which are the direct result of Wells Fargo's gross negligence or willful misconduct, which will be determined in accordance with the commercial standards of Wells Fargo's peers in the US banking industry and applicable Laws. Wells Fargo is not responsible for any claim arising from non-payment of any Item or for loss or delay in any clearing system unless it occurs as a direct result of gross negligence or willful misconduct by Wells Fargo. Damages with respect to electronic funds transfers will be limited to an amount equal to interest on the funds for each day the error or delay remains uncorrected at the applicable effective Federal Funds rate, i.e., the Federal Funds rates published by the Federal Reserve Bank of New York for each of the calendar days for which interest is payable divided by 360, reduced by a percentage equal to Wells Fargo's reserve requirement on the amount of the electronic funds transfer. Wells Fargo may at its sole discretion substitute in lieu of interest an "as of"

adjustment method of compensation, i.e., recompute Correspondent's balances for account analysis purposes as if the error or delay had not occurred. If Wells Fargo is unable to recover all or any part of funds it erroneously transferred from a transferee who has no claim to them, Wells Fargo's liability will not exceed the amount of funds which Wells Fargo is unable to recover plus interest as aforesaid. Wells Fargo will be subrogated to all rights of Correspondent against third parties and to any rights of a transferee against Correspondent in connection with any claim. In no event will Wells Fargo be liable regardless of whether any claim is based on contract or tort, for any punitive, consequential, special, or indirect losses or damages Correspondent may incur or suffer arising from or in connection with these Terms & Conditions or the provision of any Service, whether or not the likelihood or possibility of such losses or damages was known to Wells Fargo in advance. Wells Fargo will not be responsible for any loss or damage resulting from Acts of God, war, riots, terrorism, strikes, civil or industrial disturbance, malfunctions of equipment or other cause beyond Wells Fargo's control.

### 7.16.  Waiver

Wells Fargo may waive any of these Terms & Conditions but any such waiver will apply only to the term or condition waived and only for that particular occasion and will not constitute a waiver of any other term or condition.

### 7.17  Correspondent's Representations, Warranties, Acknowledgments, Responsibilities, and Covenants

Correspondent represents and warrants to Wells Fargo now and each time that Correspondent uses any Service or Account that: (i) all information, including financial information, whenever provided by Correspondent to Wells Fargo, will be true, correct and complete, and all information relating to Correspondent's financial condition accurately reflects Correspondent's financial condition as of the date(s) thereof; (ii) Correspondent is not insolvent under the Law of Correspondent's Home Jurisdiction; (iii) Correspondent is in compliance with all federal, state and local Laws, including, all Laws of the US and any state thereof applicable to Correspondent's properties, operations, business and finances and with the Laws of its Home Jurisdiction; and Correspondent's acts or omissions will not cause Wells Fargo to violate any Laws; (iv) Correspondent is duly organized and in good standing under the Laws of Correspondent's Home Jurisdiction, and Correspondent has all powers, licenses, authorizations and approvals to operate Correspondent's business

as now conducted; (v) Correspondent will promptly notify Wells Fargo of the existence of any condition or event which may constitute a breach of or default under these Terms & Conditions; (vi) Correspondent will promptly notify Wells Fargo in writing of (x) any change in Correspondent's financial condition or business; (y) any change in Correspondent's name, address or business structure, ownership or organization; and (z) any material litigation or regulatory action affecting Correspondent; and (vii) upon Wells Fargo's request therefore, Correspondent will promptly deliver to Wells Fargo true and correct copies of Correspondent's annual report and such other information regarding Correspondent's business affairs and operations including, but not limited to, income statements, balance sheets and statements of cash flows.

Correspondent agrees that as long as it has an Account with Wells Fargo, uses any of the Services, or otherwise has an outstanding Obligation to Wells Fargo or any Associate Bank that Correspondent: (i) must maintain a know your customer and anti-money laundering/anti-terrorist financing program in accordance with the description of such program furnished to Wells Fargo by Correspondent from time to time; (ii) must take all lawful, commercially reasonable steps to prevent use of a Service or the Account by a Prohibited Entity, including where appropriate scanning against published lists; (iii) must not intentionally withhold, delete or misrepresent information about a transaction or message involving Wells Fargo in any capacity, which if known to Wells Fargo would alert it that the transaction or message involves a Prohibited Entity or would otherwise be unlawful for Wells Fargo to engage; (iv) must promptly, on Wells Fargo's request, supply to Wells Fargo any documentation, other evidence, or access to Correspondent's staff and books and records to enable Wells Fargo to carry out, and be satisfied with the results of, all due diligence requirements, investigative inquiries, and any other requirements in order to meet its obligations under applicable Laws; (v) must provide all required information in order to comply with Law, and international messaging standards and guidance, including without limitation those set forth from time to time by the Financial Action Task Force or the Basel Committee on Banking Supervision, or any

successor organizations; and (vi) acknowledges and agrees that "restricted transactions" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued pursuant to that Act are prohibited from being processed through the Account or through Services provided by Wells Fargo and in the event Wells Fargo identifies a suspected restricted transaction, Wells Fargo may block or otherwise prevent or prohibit such transaction and in some circumstances may close the Account or terminate some or all Services.

### 7.18  Notice

Any notice to Correspondent will be deemed given when hand delivered or two (2) days after being sent via internationally recognized courier and addressed to Correspondent at the last address appearing on Wells Fargo's records, which Correspondent agrees that unless it notifies Wells Fargo in writing of a change of address Wells Fargo may rely on such address. Notice to Wells Fargo will be deemed given when hand delivered or two (2) days after being sent via internationally recognized courier addressed to Wells Fargo at 101 North Independence Mall East, Philadelphia, Pennsylvania 19106, USA, to the attention of International Customer Service, or such other address and party as Wells Fargo will notify Correspondent in writing. This Section will not be deemed to be an exclusive list of each means of notice from one party to the other, and specific sections in these Terms & Conditions that require notice by a given mode or in a given manner take priority for the subject matter found in the particular section.

### 7.19  Entire Terms & Conditions

These Terms & Conditions constitute Correspondent's and Wells Fargo's entire agreement and understanding with respect to the matters addressed herein and supersede all prior versions of the Terms and Conditions published by Wells Fargo or any predecessor. These Terms & Conditions may not be changed orally.

### 7.20  Headings

Headings are for ease of reference only.

# Definitions

The terms defined below, whether used in the singular or plural will have the meanings assigned:

**Account** — means, individually and collectively, Correspondent's Dollar denominated deposit or other account with Wells Fargo, including demand, money market, time, investment, certificate of deposit, and other account, including, without limitation a loan account.

**Amendment** — means an amendment to an Authorization subject to URR725.

**Associate Bank** — means any bank or other non personal entity, including, without limitation any facility, mutual fund, broker dealer or foreign financial institution which is owned or controlled, directly or indirectly, by Wells Fargo's ultimate banking holding company.

**Authorizations** — means authorizations to reimburse subject to URR725.

**Authorized Representative** — means any person duly authorized by, and who has authority to act for or to obligate Correspondent.

**Available Balance** — means the daily ending balance in Correspondent's Account after all debit and credit transactions have been posted, less the amount of any deposits that are in the process of collection.

**Business Day** — means a calendar day on which the Federal Reserve Bank of New York is open for business

**Check** — means an order to pay which may, as examples, be (i) a draft other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument can be a Check even though it is described on its face by another term, such as money order or traveler's check.

**Check 21** — means the Check Clearing for the 21st Century Act, as amended from time to time.

**Claim or Claims** — means claim as defined in URR 725.

**Correspondent** — means each customer of Wells Fargo, including any legal entity to which Wells Fargo provides these Terms & Conditions and related Services or products, and applies to such entity, regardless of whether or not such entity holds an Account on Wells Fargo's books.

**Dollar** — means the then currency of the United States of America.

**Electronic Signature or Endorsement** — means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record and includes a facsimile, replica or words, mark or code whether by machine, stamp, electronic message, or otherwise that is meant as an indication that the person adopts the intentions recorded in the agreement, document, instrument, Item or other writing regardless of by whom or by what means the actual or purported signature or endorsement is affixed.

**Home Jurisdiction** — means the jurisdiction of Correspondent's organization and if Correspondent is a branch, also the jurisdiction in which it is licensed to operate.

**Item** — means an instrument or a promise or order to pay money handled by Wells Fargo for collection or payment and depending on the context in which it is used in these Terms & Conditions, a check, draft, negotiable instrument or other written order or instruction for debit of an Account and/or the payment of money.

**Law** — means any present or future law (including common or customary law), statute, constitution, policy, decree, judgment, treaty, regulation, directive, by-law, order or any other legislative measure of any government, government agency, supranational, local government, statutory or regulatory body or court; and a provision of Law is a reference to that provision as amended or re-enacted.

**Obligations** — means all advances to, and debts, liabilities, charges, fees, obligations, agreements, promises and covenants of Correspondent arising under any agreement, the Terms & Conditions, any Service Description or otherwise, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising to Wells Fargo or any of its Associate Banks and including interest and fees that accrue after the commencement by or against Correspondent of any proceeding under any bankruptcy or insolvency Law naming such person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

**Package** — means physical documents or Items, including Checks, contained in bags or packages for delivery via mail or courier

**Privacy Notices** — means the privacy notices found at www.wellsfargo.com/privacy.

**Prohibited Entity** — means a particular country, individual, entity or class of individuals, or entities that Correspondent is notified by Wells Fargo to be a Prohibited Entity or is a Prohibited Entity under applicable Law.

**Relationship Manager** — means the Wells Fargo officer responsible for the relationship between Correspondent and Wells Fargo.

**Security Procedures** — means a procedure established by agreement between Correspondent and Wells Fargo for the purpose of verifying that a payment order, instruction or any other communication, including, without limitation, any communication amending or cancelling a payment order is that of Correspondent. A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar security devices. Comparison of a signature on a payment order, instruction, or other communication with an authorized specimen signature of the Correspondent is not by itself a security procedure. Part 3 of these Terms & Conditions sets forth the specific Security Procedures for SWIFT, telex or Web based systems agreed between Wells Fargo and Correspondent.

**Service Description** — means the relevant service descriptions and/or agreements that form an agreement between Wells Fargo and Correspondent and that evidence the specific terms and conditions for a Service or Services that Correspondent requests and that Wells Fargo elects to provide to Correspondent.

**Service** — means all services provided by Wells Fargo including, but not limited to, treasury services, depository services, letters of credit, loans and other financial accommodations unless otherwise indicated by Wells Fargo.

**Setoff** — means the right under Law or contract described in the Section of these Terms & Conditions, captioned Setoff and Security Interest, which includes the right to accelerate any Obligation owed by Correspondent or any Obligation owed to Correspondent in order to affect Setoff.

**Substitute Check** — means a paper reproduction of an original draft or check that: (i) contains an image of the front and back of the original check (the first paper check issued with respect to a particular payment transaction); (ii) bears a MICR line that, except as provided under applicable US Laws, contains all the information appearing on the MICR line of the original check at the time that the original check was issued and any additional information that was encoded on the original check's MICR line before an image of the original check was captured; (iii) conforms in paper stock, dimension, and otherwise with applicable US Laws; and (iv) Is suitable for automated processing in the same manner as the original check.

**Terms & Conditions** — means collectively, the Service Descriptions applicable to Correspondent and the agreements covered herein by these Terms & Conditions.

**UCP600** — means International Chamber of Commerce Publication Number 600, entitled: Uniform Customs and Practice for Documentary Credits, as amended from time to time and accepted by Wells Fargo for use.

**URC522** — means the International Chamber of Commerce Publication Number 522, entitled: Uniform Rules for Collections, or any subsequent revision or restatement thereof which may be adopted by the International Chamber of Commerce and accepted by Wells Fargo for use.

**URR725** — means International Chamber of Commerce Publication Number 725, entitled: Uniform Rules for Bank to Bank Reimbursements under Documentary Credits, or any subsequent revision or restatement thereof which may be adopted by the International Chamber of Commerce and accepted by Wells Fargo for use.

**US or USA** — means the United States of America.

**Uniform Commercial Code** — means the Uniform Commercial Code of the State of New York as amended from time to time.

# EXHIBIT "B"

PRINTED BY TurboSwift AT:    2015.01.21 19:08:08    FOR: AUSTECEQX100

***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****

Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
    Direction: Input                    WELLS FARGO BANK, N.A.
     Priority: Normal                   375 PARK AVENUE
      Session: 8121                     NY 4080
     Sequence: 339143                   NEW YORK,NY
                                        Input Output ACK   NAK   DUP   AUTH
    MIR: 150112AUSTECEQA1008121339143   Time  Time  Flag  Code  Flag  Code
    MOR:                                ----- ----- ----  ----- ----- -----
    MUR:                                1924        0                 --SP--

    NOTE:

1:      MESSAGE HEADER
        F01AUSTECEQX100
2:      APPLICATION HEADER
        I103PNBPUS3NXNYCN
4:      MESSAGE TEXT
:20:    Sender's Reference
TRN:               150112191227108C
:23B:   Bank Operation Code
        CRED
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:        150112
Currency Code:     USD
Settled Amount:         986'256,88
:50K:   Ordering Customer
Optional Account Line: ███████5218
Name & Address:        MARINA BREEZE S.A.
                       RUC:2490004206001 AD:CALLE ALBERTO
                       BORGES, ENTRADA 1
                       GUAYAQUIL - ECUADOR
:57A:   Account With Institution
Optional Account Line: /████████8838
Identifier Code:       HSBCHKHHHKH
                       HONGKONG AND SHANGHAI BANKING CORPO
                       1 QUEEN'S ROAD CENTRAL
                       (ALL HK OFFICES AND HEAD OFFICE)
                       HONG KONG
:59:    Beneficiary Customer
Optional Account Line: ███████8838
Name & Address:        MESTER TRADING CORPORATION CO
                       LIMITED
                       TIAN HE QU GUANG YUAN DONG LU FU
                       HONG KONG
:70:    Remittance Information
Free Format:           /REC/ PAGO FACTURA No 178550
                       //REC// FACTURA No 185260
:71A:   Details of Charges
        OUR
5:      TRAILER
CHK:    Checksum       E495F17DC51B

                    **** END OF MESSAGE ****

                                                        18 — 31

TS

PRINTED BY TurboSwift AT:     2015.01.21 19:08:30     FOR: AUSTECEQX100

***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****

Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103      Sent/Received: PNBPUS3NXNYC
   Direction: Input                      WELLS FARGO BANK, N.A.
    Priority: Normal                     375 PARK AVENUE
     Session: 8121                       NY 4080
    Sequence: 339142                     NEW YORK,NY

| Input Output ACK | | NAK | DUP | AUTH |
|---|---|---|---|---|
| Time | Time | Flag | Code | Flag | Code |

MIR: 150112AUSTECEQA1008121339142
MOR:
NUR:                              1902        0                      SP--

NOTE:

1:        MESSAGE HEADER
          F01AUSTECEQX100
2:        APPLICATION HEADER
          I103PNBPUS3NXNYCN
4:        MESSAGE TEXT
:20:      Sender's Reference
TRN:                         150112185203108C ✻
:23B:     Bank Operation Code
                             CRED
:32A:     Value Date, Currency Code, Interbank Settled Amount
                             150112
                             USD
                                    1'424'638,06

          Customer
          Line:        ██████7611
                       FEMAR S.A.
                       RUC:████████6001 AD:EDIF QUEZADA
                       AV MACHALA 904 Y 9OCTUBRE
                       GUAYAQUIL - ECUADOR

:57A:     Account With Institution
Optional Account Line:      ███2838
Identifier Code:       HSBCHKHHHKH
                       HONGKONG AND SHANGHAI BANKING CORPO
                       1 QUEEN'S ROAD CENTRAL
                       (ALL HK OFFICES AND HEAD OFFICE)
                       HONG KONG

:59:      Beneficiary Customer
Optional Account Line:  /███████2838
Name & Address:        REGAL PROSPER TRADING LIMITED
                       32 TSIM SHA TSUI  SHARON STREET
                       HONG KONG, CHINA

:70:      Remittance Information
Free Format:           /REC/ CANCELACION FACT 20152Q030
                       //REC// LIQ 38526544 FACT 2015B33

:71A:     Details of Charges
                       OUR

5:        TRAILER
CHK:      Checksum        357F6DAEB38C

                   **** END OF MESSAGE ****

(4)

PRINTED BY TurboSwift AT:     2015.01.21 19:08:47     FOR: AUSTECEQX100

---
***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
---

Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103     Sent/Received: PNBPUS3NXNYC
    Direction: Input
    Priority: Normal
    Session: 8126
    Sequence: 339349

MIR: 150113AUSTECEQA1008126339349
MOR:
MUR:

WELLS FARGO BANK, N.A.
375 PARK AVENUE
NY 4080
NEW YORK,NY

| Input Time | Output Time | ACK Flag | NAK Code | DUP Flag | AUTH Code |
|------------|-------------|----------|----------|----------|-----------|
|            | 1904        | O        |          |          | SP--      |

NOTE:

---

1:      MESSAGE HEADER
        F01AUSTECEQX100
2:      APPLICATION HEADER
        I103PNBPUS3NXNYCN
4:      MESSAGE TEXT
:20:    Sender's Reference
TRN:                        1501131842201430
:23B:   Bank Operation Code
                            CRED
:23E:   Instruction Code
Code:                       SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:                 150113
Currency Code:              USD
Settled Amount:                        1'236'578,45
:50K:   Ordering Customer
Optional Account Line:   /C████5976
Name & Address:          CONSTRINDEC S.A. RUC.0992452013001
                         CDLA SAUCES IX MZ L 10 SOL 2 PB
                         GUAYAQUIL- ECUADOR
:57A:   Account With Institution
Optional Account Line;   /████12830
Identifier Code:         HSBCHKHHHKH
                         HONGKONG AND SHANGHAI BANKING CORPO
                         1 QUEEN'S ROAD CENTRAL
                         (ALL HK OFFICES AND HEAD OFFICE)
                         HONG KONG
:59:    Beneficiary Customer
Optional Account Line:   /████838
Name & Address:          REGAL PROSPER TRADING LIMITED
                         32 TSIM SAH TSUI, SHARON STREET
                         HONG KONG, CHINA
:70:    Remittance Information
Free Format:             /REC/ POR COMPRA 14512
                         //REC// DE MAQUINAS INDUSTRIALES
:71A:   Details of Charges
                         OUR
5:      TRAILER
CHK:    Checksum         D8D7B8869828

                    **** END OF MESSAGE ****

PRINTED BY TurboSwift AT:    2015.01.21 19:09:07    FOR: AUSTECEQX100

***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****

Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
    Direction: Input                WELLS FARGO BANK, N.A.
    Priority: Normal                375 PARK AVENUE
    Session: 8127                   NY 4080
    Sequence: 339351                NEW YORK,NY

MIR: 150113AUSTECEQA1008127339351
MOR:
MUR:

| Input Time | Output Time | ACK Flag | NAK Code | DUP Flag | AUTH Code |
|---|---|---|---|---|---|
| 2116 | 0 | | | | SP-- |

NOTE:

1:        MESSAGE HEADER
          F01AUSTECEQX100
2:        APPLICATION HEADER
          I103PNBPUS3NXNYCN
4:        MESSAGE TEXT
:20:      Sender's Reference
TRN:               CAMGYE1501132050
:23B:     Bank Operation Code
                   CRED
:32A:     Value Date, Currency Code, Interbank Settled Amount
Value Date:        150113
Currency Code:     USD
Settled Amount:            663'297,31
:50K:     Ordering Customer
Optional Account Line: A▉▉▉▉▉2980
Name & Address:    ECONOTRANS ECUADOR S.A.
                   RUC ▉▉▉▉6001 AD:SAMBORONDON
                   BUSINESS KM 1.5 VIA LA PUNTILLA
                   GUAYAQUIL - ECUADOR
:57A:     Account With Institution
Optional Account Line: A▉▉▉▉2838
Identifier Code:   HSBCHKHHHKH
                   HONGKONG AND SHANGHAI BANKING CORPO
                   1 QUEEN'S ROAD CENTRAL
                   (ALL HK OFFICES AND HEAD OFFICE)
                   HONG KONG
:59:      Beneficiary Customer
Optional Account Line: A▉▉▉▉2838
Name & Address:    REGAL PROSPER TRADING LIMITED
                   32 TSIM SAH TSUI, SHARON STREET
                   HONG KONG, CHINA
:70:      Remittance Information
Free Format:       /REC/ CANC. FACT 20153Q128
                   //REC// LIQ 395644333 FACT 20154B13
:71A:     Details of Charges
                   OUR
5:        TRAILER
CHK:      Checksum           09B4A20661DC

                   **** END OF MESSAGE ****

(5)

PRINTED BY TurboSwift AT:    2015.01.21 19:46:36    FOR: AUSTECEQX100
-------------------------------------------------------------------------
**** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
-------------------------------------------------------------------------
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103      Sent/Received: PNBPUS3NXNYC
    Direction: Input                    WELLS FARGO BANK, N.A.
    Priority: Normal                    375 PARK AVENUE
    Session: 8127                       NY 4080
    Sequence: 339352                    NEW YORK,NY
                                        Input Output ACK  NAK    DUP   AUTH
                                        Time   Time  Flag Code   Flag  Code
  MIR: 150113AUSTECEQA1008127339352     ----- -----  ---- -----  ----- ----
  MOR:                                  (2238)        0          ----- SP--
  MUR:

NOTE:--------------------------------------------------------------------

1:       MESSAGE HEADER
         F01AUSTECEQX100
2:       APPLICATION HEADER
         I103PNBPUS3NXNYCN
4:       MESSAGE TEXT
:20:     Sender's Reference
TRN:                 CAMGYE1501132053
:23B:    Bank Operation Code
                     CRED
:32A:    Value Date, Currency Code, Interbank Settled Amount
Value Date:          150113
Currency Code:       USD
Settled Amount:              96'325,23
:50K:    Ordering Customer
Optional Account Line:   ████████2980
Name & Address:          ECONOTRANS ECUADOR S.A.
                         RUC: ██ ██ █6001 AD:SAMBORONDON
                         BUSINESS KM ▓.5 VIA LA PUNTILLA
                         GUAYAQUIL – ECUADOR
:57A:    Account With Institution
Optional Account Line:
Identifier Code:         CHASUS33XXX
                         JPMORGAN CHASE BANK, N.A.
                         4 NEW YORK PLAZA
                         FLOOR 15
                         NEW YORK,NY
:59:     Beneficiary Customer
Optional Account Line:   /████████0491
Name & Address:          NECTALI MARTINEZ HERNANDEZ
                         184 SEMINOLE LAKES DR
                         WEST PALM BEACH, FL 33411
                         FL. USA
:70:     Remittance Information
Free Format:             /PAYMENT CHARGE REF-3251263
:71A:    Details of Charges
                         OUR
5:       TRAILER
CHK:     Checksum        181900619ACA

                     **** END OF MESSAGE ****

(7)

PRINTED BY TurboSwift AT:    2015.01.21 19:07:44    FOR: AUSTECEQX100
-----------------------------------------------------------------
***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
-----------------------------------------------------------------
```
    Message Name: SINGLE CUSTOMER CREDIT TRANSFER
    Message Type: F 103  Sent/Received: PNBPUS3NXNYC
       Direction: Input               WELLS FARGO BANK, N.A.
        Priority: Normal              375 PARK AVENUE
         Session: 8130                NY 4080
        Sequence: 339527              NEW YORK,NY
                                      Input Output ACK   NAK    DUP  AUTH
    MIR: 150115AUSTECEQA1008130339527 Time  Time   Flag  Code   Flag Code
    MOR:                              ----- ------ ----  ------ ---- ----
    MUR:                              0001         0            ----- SP--

    NOTE:
```
-----------------------------------------------------------------
```
1:      MESSAGE HEADER
        F01AUSTECEQX100
2:      APPLICATION HEADER
        I103PNBPUS3NXNYCN
4:      MESSAGE TEXT
:20:    Sender's Reference
TRN:                    1501142514368542
:23B:   Bank Operation Code
                        CRED
:23E:   Instruction Code
Code:                   SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:             150114
Currency Code:          USD
Settled Amount:         1'485'230,89
:50K:   Ordering Customer
Optional Account Line:  /C████6631
Name & Address:         AUDIOVISION ELECTRONICA AUDIOLEC
                        S.A. RUC ██2██████9001 KM. 4 VIA
                        DURAN TANBO
                        GUAYAQUIL - ECUADOR
:57A:   Account With Institution
Optional Account Line:  /██████2838
Identifier Code:        HSBCHKHHHKH
                        HONGKONG AND SHANGHAI BANKING CORPO
                        1 QUEEN'S ROAD CENTRAL
                        (ALL HK OFFICES AND HEAD OFFICE)
                        HONG KONG
:59:    Beneficiary Customer
Optional Account Line:  /██████2838
Name & Address:         REGAL PROSPER TRADING LIMITED
                        32 TSIM SAH TSUI, SHARON STREET
                        HONG KONG, CHINA
:70:    Remittance Information
Free Format:            REF:CANCELACION FACTURA 1062746881
:71A:   Details of Charges
                        OUR
5:      TRAILER
CHK:    Checksum        7F10448008EB


               **** END OF MESSAGE ****
```

PRINTED BY TurboSwift AT:   2015.01.21 19:15:22    FOR: AUSTECEQX100

-----------------------------------------------------------------

***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****

```
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
   Direction: Input                WELLS FARGO BANK, N.A.
    Priority: Normal               375 PARK AVENUE
     Session: 8130                 NY 4080
    Sequence: 339526               NEW YORK,NY
```

|  | Input Time | Output Time | ACK Flag | NAK Code | DUP Flag | AUTH Code |
|---|---|---|---|---|---|---|
| MIR: 150114AUSTECEQA1008130339526 |  |  |  |  |  |  |
| MOR: |  |  |  |  |  |  |
| MUR: | 2351 |  | 0 |  | ----- | SP-- |

NOTE:

-----------------------------------------------------------------

```
1:      MESSAGE HEADER
        F01AUSTECEQX100
2:      APPLICATION HEADER
        I103PNBPUS3NXNYCN
4:      MESSAGE TEXT
:20:    Sender's Reference
TRN:                   1501141844201458
:23B:   Bank Operation Code
                       CRED
:23E:   Instruction Code
Code:                  SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:            150114
Currency Code:         USD
Settled Amount:            1'375'240,23
:50K:   Ordering Customer
Optional Account Line: /         976
Name & Address:        CONSTRINDEC S.A. RUC.0992452013001
                       CDLA SAUCES IX MZ L 10 SOL 2 PB
                       GUAYAQUIL- ECUADOR
:57A:   Account With Institution
Optional Account Line: /        2838
Identifier Code:       HSBCHKHHHKH
                       HONGKONG AND SHANGHAI BANKING CORPO
                       1 QUEEN'S ROAD CENTRAL
                       (ALL HK OFFICES AND HEAD OFFICE)
                       HONG KONG
:59:    Beneficiary Customer
Optional Account Line: /        2838
Name & Address:        REGAL PROSPER TRADING LIMITED
                       32 TSIM SAH TSUI, SHARON STREET
                       HONG KONG, CHINA
:70:    Remittance Information
Free Format:           /REC/ PAGO ADICION FACT-25213
                       //REC// DE MAQUINAS INDUSTRIALES
:71A:   Details of Charges
                       OUR
5:      TRAILER
CHK:    Checksum        AC40E9844019
```

                    **** END OF MESSAGE ****

PRINTED BY TurboSwift AT:    2015.01.21 19:11:24    FOR: AUSTECEQXXXX

**** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****

```
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
   Direction: Input              WELLS FARGO BANK, N.A.
    Priority: Normal             375 PARK AVENUE
     Session: 8129               NY 4080
    Sequence: 339524             NEW YORK,NY
                                 Input Output ACK    NAK   DUP  AUTH
  MIR: 150114AUSTECEQAXXX8129339524    Time   Time Flag Code Flag Code
  MOR:                          ----- ------ ---- ------ ----- ----
  MUR:                          1906          0          ----- SP--

  NOTE:
```

```
1:    MESSAGE HEADER
      F01AUSTECEQXXXX
2:    APPLICATION HEADER
      I103PNBPUS3NXNYCN
4:    MESSAGE TEXT
:20:   Sender's Reference
TRN:             CAMGYE1501144856
:23B:  Bank Operation Code
                 CRED
:32A:  Value Date, Currency Code, Interbank Settled Amount
Value Date:      150114
Currency Code:   USD
Settled Amount:       1'486'230,22
:50K:  Ordering Customer
Optional Account Line:   /       6631
Name & Address:  AUDIOVISION ELECTRONICA AUDIOLEC
                 S.A. RUC 0992559829001 KM. 4 VIA
                 DURAN TAMBO
                 GUAYAQUIL - ECUADOR
:57A:  Account With Institution
Optional Account Line:
Identifier Code:      WFBIUS6SLAX
                 WELLS FARGO NA
                 707 WILSHIRE BOULEVARD
                 LOS ANGELES CA
:59:   Beneficiary Customer
Optional Account Line:   /       2591
Name & Address:  JOSE MARIANO CASTILLO
                 700 SOUTH FLOWER STREET, SUITE 1100
                 LOS ANGELES, CALIFORNIA 90017, EEUU
:70:   Remittance Information
Free Format:          /REF: PAYMENT FACT-INV14-331-100000
:71A:  Details of Charges
                 OUR
5:    TRAILER
CHK:   Checksum      461A95770651
```

                    **** END OF MESSAGE ****

```
LIMTED BY TurbosWIFT AT:      2016.01.21 19:31:33      FOR: AUSTECEQX100

*** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
------------------------------------------------------------------------
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103      Sent/Received: PNBPUS3NXNYC
    Direction: Input                  WELLS FARGO BANK, N.A.
    Priority: NORMAL                  375 PARK AVENUE
     Session: 3138                    NY 4080
    Sequence: 339836                  NEW YORK,NY
                                      Input  Output  ACK    NAK    DUP    AUTH
MIR: 150116AUSTECEQA1008138339836     Time   Time    Flag   Code   Flag   Code
MOR:                                  -----  -----   ----   -----  ----   -----
MUR:                                  1829           0                    SP--

NOTE:
------------------------------------------------------------------------
        MESSAGE HEADER
        FO1AUSTECEQX100
        APPLICATION HEADER
        I103PNBPUS3NXNYCN
        MESSAGE TEXT
:20:    Sender's Reference
               CEX2015011645215
TRN:
:23B:   Bank Operation Code
               CRED
:23E:   Instruction Code
Code:          SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:    150116
Currency Code: USD
Settled Amount:     1'056'780,56
:50K:   Ordering Customer
Optional Account line: /        832
Name & Address:        COSMICA CIA LTDA.
                       PANAMERICANA NORTE KM. 7 1/2
                       RUC.0180063687001
                       CUENCA-ECUADOR
:56A:   Intermediary Institution
Optional Account line: /        1743
Identifier Code:       MSHQUS33XXX
                       MASHREQBANK PSC., NEW YORK BRANCH
                       255 5TH AVENUE
                       NEW YORK,NY
:57A:   Account With Institution
Optional Account line:
Identifier Code:       BOMLAEARXXX
                       MASHREQBANK PSC.
                       AL GHURAIR CITY
                       339-C, AGO
                       DUBAI
:59:    Beneficiary Customer
Optional Account line: /          09685
Name & Address:        FRATELLI INVESTMENTS LIMITED
:70:    Remittance Information
Free Format:           /BNF: FACT-1425-EV-41526-002
                       //PAGO CONSTRUCCIONES Y MAQUINARIAS
:71A:   Details of Charges
               OUR
5:      TRAILER
CHK:    Checksum       74CDABBCB62A

                 **** END OF MESSAGE ****
```

PRINTED BY TurboSwift AT:    2015.02.13 12:16:22    FOR: AUSTECEQX100
------------------------------------------------------------------------
***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
------------------------------------------------------------------------
```
    Message Name:  SINGLE CUSTOMER CREDIT TRANSFER
    Message Type:  F 103   Sent/Received: PNBPUS3NXNYC
       Direction:  Input                 WELLS FARGO BANK, N.A.
        Priority:  Normal                375 PARK AVENUE
         Session:  8140                  NY 4080
        Sequence:  339839                NEW YORK,NY
                                         Input Output ACK   NAK    DUP   AUTH
     MIR: 150116AUSTECEQA1008140339839   Time  Time  Flag  Code   Flag  Code
     MOR:                                ----- ------ ----  ------  ----- ----
     MUR:                                1856         0             ----- SP--

    NOTE:
```
------------------------------------------------------------------------
```
1:        MESSAGE HEADER
          F01AUSTECEQX100
2:        APPLICATION HEADER
          I103PNBPUS3NXNYCN
4:        MESSAGE TEXT
:20:      Sender's Reference
TRN:                CAMGYE2015011645
:23B:     Bank Operation Code
                    CRED
:23E:     Instruction Code
Code:               SDVA
Description:
:32A:     Value Date, Currency Code, Interbank Settled Amount
Value Date:         150116
Currency Code:      USD
Settled Amount:              298'223,15
:50K:     Ordering Customer
Optional Account Line:  /████8287
Name & Address:     INDUSUR INDUSTRIAL DEL SUR S.A.
:57A:     Account With Institution
Optional Account Line:  /████1838
Identifier Code:    HSBCHKHHHKH
                    HONGKONG AND SHANGHAI BANKING CORPO
                    1 QUEEN'S ROAD CENTRAL
                    (ALL HK OFFICES AND HEAD OFFICE)
                    HONG KONG
:59:      Beneficiary Customer
Optional Account Line:  /████1838
Name & Address:     UNIT 20508A 25F BANK OF AMERICA T12
:70:      Remittance Information
Free Format:        /PAYMENT CHAR F-TC-21020-G125-001
                    MATERIALS
:71A:     Details of Charges
                    OUR
5:        TRAILER
CHK:      Checksum        3FF5774D0B04
```

                    **** END OF MESSAGE ****

⑩

PRINTED BY TurboSwift AT:   2015.02.13 12:15:50    FOR: AUSTECEQX100
--------------------------------------------------------------------
***** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
--------------------------------------------------------------------
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
    Direction: Input              WELLS FARGO BANK, N.A.
     Priority: Normal             375 PARK AVENUE
      Session: 8141               NY 4080
     Sequence: 339841             NEW YORK,NY

MIR: 150116AUSTECEQA1008141339841
MOR:
MUR:

| Input<br>Time | Output<br>Time | ACK<br>Flag | NAK<br>Code | DUP<br>Flag | AUTH<br>Code |
|------|------|------|------|------|------|
| 2346 |      | 0    |      |      | SP-- |

NOTE:
--------------------------------------------------------------------
1:       MESSAGE HEADER
         F01AUSTECEQX100
2:       APPLICATION HEADER
         I103PNBPUS3NXNYCN
4:       MESSAGE TEXT
:20:     Sender's Reference
TRN:              CAMGYE1501160052
:23B:   Bank Operation Code
                  CRED
:23E:   Instruction Code
Code:             SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:       150116
Currency Code:    USD
Settled Amount:           95'731,18
:50K:   Ordering Customer
Optional Account Line:  /████ 645
Name & Address:   RASLOGEC S.A.RU:0992860677001
                  KM 1 5 VIA SAMBORONDON EDIF
                  OFFICCE CENTER PISO 3 PH 2097281
                  GUAYAQUIL-ECUADOR
:57A:   Account With Institution
Optional Account Line:
Identifier Code:  HASEHKHHXXX
                  HANG SENG BANK LIMITED
                  83 DES VOEUX ROAD, CENTRAL
                  HONG KONG
:59:    Beneficiary Customer
Optional Account Line:  /████ ██ 3883
Name & Address:   JGM ASIA TELECOM LIMITED
                  ROOM 905 WORKING BERG
                  COMMERCIAL BUILDING, 41-47 MARBLE
                  ROAD, HONG KONG
:70:    Remittance Information
Free Format:      /PAYMENT ████████ -2563
:71A:   Details of Charges
                  OUR
5:      TRAILER
CHK:    Checksum      473985B66EA1

            **** END OF MESSAGE ****

12

PRINTED BY TurboSwift AT:    2015.02.13 12:17:16    FOR: AUSTECEQXXXX
------------------------------------------------------------------------
**** CAUTION *** COPY COPY COPY COPY COPY COPY COPY COPY COPY *** CAUTION ****
------------------------------------------------------------------------
Message Name: SINGLE CUSTOMER CREDIT TRANSFER
Message Type: F 103    Sent/Received: PNBPUS3NXNYC
   Direction: Input                WELLS FARGO BANK, N.A.
    Priority: Normal               375 PARK AVENUE
     Session: 8159                 NY 4080
    Sequence: 340186               NEW YORK,NY

                                   Input  Output  ACK    NAK    DUP    AUTH
  MIR: 150120AUSTECEQAXXX8159340186  Time   Time   Flag   Code   Flag   Code
  MOR:                             -----  ------  ----  ------  -----  ----
  MUR:                             1956     0                   ----- SP--

  NOTE:
------------------------------------------------------------------------
1:      MESSAGE HEADER
        F01AUSTECEQXXXX
2:      APPLICATION HEADER
        I103PNBPUS3NXNYCN
4:      MESSAGE TEXT
:20:    Sender's Reference
TRN:            GYE2015012015263
:23B:   Bank Operation Code
                CRED
:23E:   Instruction Code
Code:           SDVA
Description:
:32A:   Value Date, Currency Code, Interbank Settled Amount
Value Date:     150120
Currency Code:  USD
Settled Amount:         1'968'230,25
:50K:   Ordering Customer
Optional Account Line:  /       5312
Name & Address:         COMERCIALIZADORA AUTOLINE SA
                        RUC.1891706630001
                        AV ELOY ALFARO S/N Y ALFONSO
                        ALTAMIRANO FRENTE AL TERMINAL DE CA
:57A:   Account With Institution
Optional Account Line:  /       9838
Identifier Code:        HSBCHKHHHKH
                        HONGKONG AND SHANGHAI BANKING CORPO
                        1 QUEEN'S ROAD CENTRAL
                        (ALL HK OFFICES AND HEAD OFFICE)
                        HONG KONG
:59:    Beneficiary Customer
Optional Account Line:  /       9838
Name & Address:         JIUSHUN GROUP CO., LIMITED
                        HONG KONG
:70:    Remittance Information
Free Format:            REF:CANCELACION F./001-00021523-
                        P/128/15
:71A:   Details of Charges
                        OUR
5:      TRAILER
CHK:    Checksum        E2C9FBBC79A8

                **** END OF MESSAGE ****

# EXHIBIT "C"



**BANCO DEL AUSTRO**

www.bancodelaustro.com
Matriz Cuenca
Sucre y Borrero esq.
Telf.: (593 7) 2842511
Télex: 048560
Fax: (593 7) 2831067
Casilla 01.01.0167
Cable BANAUS

April 7, 2015

WELLS FARGO BANK

**Attention:** Mery Bonsly E. Brock, CFE - Financial Crime Manager

On January 21, 2015, Banco del Austro reported that unauthorized debits from the account maintained at Wells Fargo Bank were made, those were determined to be fraudulent transactions. Complying with the respective formalities, Banco del Austro issued fraud alerts through Swift for all and each of the 12 unauthorized transfers which are detailed below:

| DATE | SENDER | AMOUNT | BENEFICIARY | BENEFICIARY BANK | CITY |
|------|--------|--------|-------------|------------------|------|
| 1/12/2015 | MARINA BREEZE | 985,256.88 | MESTER TRADING CORPORATION | HSBC | HONG KONG |
| 1/12/2015 | FEMAR | 1,424,638.06 | REGAL PROSPER TRADING LIMITED | HSBC | HONG KONG |
| 1/13/2015 | CONSTRUNDEC S.A. | 1,236,578.45 | REGAL PROSPER TRADING LIMITED | HSBC | HONG KONG |
| 1/13/2015 | ECONOTRANS ECUADOR | 663,297.31 | REGAL PROSPER TRADING LIMITED | HSBC | HONG KONG |
| 1/13/2015 | ECONOTRANS ECUADOR | 96,325.23 | NECTALI MARTINEZ HERNANDEZ | JPMORGAN CHASE | NEW YORK |
| 1/14/2015 | AUDIOELEC | 1,485,230.69 | REGAL PROSPER TRADING LIMITED | HSBC | HONG KONG |
| 1/13/2015 | CONSTRUNDEC S.A. | 1,575,240.23 | REGAL PROSPER TRADING LIMITED | HSBC | HONG KONG |
| 1/14/2015 | AUDIOELEC | 1,486,230.22 | JOSE MARIANO CASTILLO | WELLS FARGO | LOS ANGELES |
| 1/16/2015 | COSMICA | 1,066,780.56 | FRATELLI INSVESTMENTS LIMITED | MASHREQBANK PSC | DUBAI |
| 1/20/2015 | INDISIR | 298,223.15 | NO BENEFICIARY | HSBC | HONG KONG |
| 1/20/2015 | RASLOGEC | 95,731.18 | ASIA TELECOM | HANG SENG BANK | HONG KONG |
| 1/21/2015 | AUTOLINE | 1,968,230.25 | JIUSHUN GROUP CO. | HSBC | HONG KONG |
| | **TOTAL** | **12,172,762.41** | | | |

All fraud alerts where denounced and reported to Wells Fargo representatives in Ecuador, Lorena Castillo and Susana Cires; among other fraudulent transfers as follows:

- Transfer of USD 1,968,230.25 whose ultimate beneficiary was the Jiushun Group in Hong Kong; although such transfer was made at 21:55 of January 21, 2015 and Banco del Austro issued fraud alerts at 22:30 the same day of the fraud, Wells Fargo did not act promptly to withhold funds and comply with its subsequent reimbursement to Banco del Austro account in Wells Fargo.

- Transfer of USD 1,486,230.22 processed on January 14, 2015 at 19:06 was credited to the account of a customer at Wells Fargo in the United States. On February 18, 2015 Wells Fargo credits Banco del Austro's account the amount of USD 958,700.27. The client had enough time to use the remaining USD 527,529.95. At the moment we still haven't received information from Wells Fargo regarding the procedure to be followed in order for Banco del Austro to receive this outstanding balance.



**+ ágil + seguro**



**BANCO DEL AUSTRO**

www.bancodelaustro.com
Matriz Cuenca
Sucre y Borrero esq.
Telf.: (593 7) 2842511
Télex: 048560
Fax: (593 7) 2831067
Casilla 01.01.0167
Cable BANAUS

- Additionally there were two other wire transfers sent to Dubai for the amount USD 1,056,780.56 in January 16, 2015, and to Hong Kong for the amount of USD 298,223.15 in January 20, 2015. These unauthorized transactions could not be completed since they were not correctly processed.

Each and every one of the unauthorized wire transfers were performed outside normal operating hours of Banco del Austro, it included transactions of significant amounts which undoubtedly should have triggered an alert at Wells Fargo in their control and verification of the transactions that were being processed.

It is important to mention that on the same day of January 21, 2015 an unauthorized wire transfer was made from the account that Banco del Austro maintains at Citibank, in identical circumstances, the prompt response and controls of Citibank resulted on the immediate refund of the funds to our account.

As it is clearly shown, Wells Fargo procedures after the fraud alerts were sent by Banco del Austro, in this and other unauthorized wire transfers, where not acted with appropriate and immediate diligence.

For the foregoing, knowing of the economic damage and reputational risk caused to Banco del Austro, we request the immediate return of the amounts that were improperly transferred from the Banco del Austro account at Wells Fargo, which are detailed in this document and which it was alerted to you in a timely and appropriate manner.

All the information related to this fraud has been sent to you.

Sincerely,

Ing. Guillermo Talbot Dueñas
General Manager
BANCO DEL AUSTRO S.A.

Ing. Danny Hurtado Parreño
Treasure and Financial Manager
BANCO DEL AUSTRO S.A.

Dr. Juan Vélez Palacios
Attorney General
BANCO DEL AUSTRO S.A.

+ ágil + seguro